[Civ. No. 8036.   Third Dist.   June 4, 1952.]

JOHN L. McATEE, Plaintiff and Appellant, v. CITY OF MARYSVILLE, Defendant and Appellant.

Robert W. Steel and Erling S. Norby for Plaintiff and Appellant.

Francis E. Carlin, City Attorney, Rich, Carlin & Fuidge for Defendant and Appellant.

VAN DYKE, J.—This action was brought under the provisions of the Public Liability Act of 1923. Plaintiff McAtee was injured when one of the wheels of the automobile in which he was riding ran into a hole in a street in the city of Marysville. The action was tried to a jury which returned a verdict in favor of defendant city and judgment was entered in conformity therewith. The trial court thereafter granted a new trial upon all issues, specifying as the basis of the order the insufficiency of the evidence to justify the verdict and that it was against law. From that order the defendant city has appealed. Contending that there were

errors in the instructions to the jury the plaintiff has cross-appealed from the judgment entered upon the verdict. We shall refer to the city as appellant and to the plaintiff as respondent.

The accident occurred at a point within the southeast portion of the northwest quadrant of the intersection of 10th and Yuba Streets in Marysville. In 1905, and when the easterly portion of Marysville, in which the intersection is located, contained but few residents, the city laid a 10-inch sewer line composed of terra cotta pipe intended to carry sewage by gravity from the easterly portion of Marysville in a westerly direction and to a point of disposal. The line at the intersection of 10th and Yuba Streets lay 2 or 3 feet beneath the surface. In 1929, and when the population of eastern Marysville had substantially increased and the high school was being built north of the intersection involved, the city laid a second sewer line consisting of 12-inch concrete pipe running southerly on Yuba Street and emptying into a sump on the southeast corner of the intersection. Two pumps were installed at the sump for the purpose of pumping the collected sewage up into the 10-inch line whence, along with the sewage collected in that line, it all flowed westerly to the point of disposal. Where the 12-inch line passed beneath the intersection it was approximately 12 feet below the surface. The intersection at 10th and Yuba Streets is subjected to heavy traffic, including the passage over it of loaded logging trucks coming from the easterly mountains. In March, 1949, in the year preceding the accident to respondent, a city employee noted a damp area in the intersection and reported the matter to the city engineer. The area was excavated and a break was found in the 10-inch line. One section of terra cotta pipe had collapsed and three others were cracked. The break was repaired by substituting sections of concrete pipe. During the following summer the city tore out the paved portion of the intersection and replaced the paving with 10 inches of gravel covered by 2 or 3 inches of black top. The city also, at the point where the logging trucks generally turned from Yuba onto 10th, added gravel and black top over the area they would thus traverse. The burden of duty of the sewer pipes steadily increased with the increase of population in the area served and the 10-inch terra cotta line was itself considerably extended to serve a greater area east of the intersection. The result was that the carrying capacity of the

10-inch line was at times, particularly in wet weather, so taxed that the pumps sometimes created internal pressure in the terra cotta line for a considerable distance around the intersection. There was evidence that terra cotta pipe of the kind used when the line was laid was not fitted to withstand such pressure. The accident occurred February 4, 1950, during rainy weather when the discharge from the sewer system was high. Two city employees went through the intersection about four or five hours before the time of the accident, but there was either no indication of trouble in the intersection at that time or, if there was, they did not observe it. When the wheel of the car in which plaintiff was riding dropped into the recess the car came to a sudden stop, throwing plaintiff against the forward part of the interior of the car and causing him serious injury. The driver, to extricate the car, "rocked" it back and forth until he succeeded in getting the wheel out of the hole. The next morning the city engineer discovered the hole, at which time he said it was about one and a half feet in width and was conical in shape. The water would rise and fall in the hole as the pumps would go on and off. The section of black top which had covered the hole had disappeared. The city engineer testified that he had been concerned with the situation at the intersection, particularly because of the truck traffic over it; that the city knew there was internal pressure exerted by the pumps in the terra cotta line and he had observed at various times that sewage was discharged through a manhole on the surface of the street one-half block west of the intersection, sometimes spurting up 6 to 8 inches. He testified that the lines became overloaded in the later months of the wintertime and that when the pumps would go on at the sump, throwing the load on the terra cotta line, the sewage would be backed up and the lines overloaded. Before the accident happened the city had commenced construction of a new disposal line which would eliminate the pumping from the sump into the terra cotta line. An engineer called by respondent testified that in his opinion the condition of the terra cotta line and the fact that it was under pressure and full of water and sewage would lead him to expect breaks in the line at the intersection and he said further that pipe of that type was never used under pressure. He said that, considering the condition of the pipe itself, the fact that it was under pressure, and full of water from other sources being carried in the pipe, it was his opinion it would very

likely break from internal pressure. He testified that this opinion would be strengthened, considering that the line had broken on one occasion, and considering that in periods of storm sewage spurted from the manhole near the intersection.

"The rule is well established that an appellate court will not reverse an order of a trial court granting or refusing a new trial unless it can be said as matter of law that there was no substantial evidence to support a judgment for the moving party, or that there was a clear or manifest abuse of discretion on the part of the trial court in granting the new trial. . . . The rule as stated in *Mazzotta* v. *Los Angeles Ry. Corp.*, 25 Cal.2d 165, 168 [153 P.2d 338], is that if the evidence as a whole would be insufficient as a matter of law to support a verdict in favor of the moving party, the order appealed from should be reversed. . . . In *Seth* v. *Lew Hing*, 125 Cal. App. 729, 732 [14 P.2d 537, 15 P.2d 190], in which an order granting a new trial was reversed and a hearing in the Supreme Court denied, the rule was thus stated: 'Preliminarily we should consider the function of this court on an appeal from an order granting a new trial. On this point the authorities are in accord with the statement found in *Moss* v. *Stubbs,* 111 Cal.App. 359, 363 [295 P. 572, 296 P. 86], that "It is equally well settled that where there is no substantial conflict in the testimony on material issues, and the evidence as a whole would be insufficient as a matter of law to support a verdict in favor of the moving party, an order granting a new trial cannot be sustained." ' " (*Martin* v. *Smith,* 103 Cal.App.2d 894, 897 [230 P.2d 679].)

It is well settled that when a public improvement, such as was involved in the instant case, has been planned by city officials and constructed in accordance with such plans, and when it is shown that by carrying out the plan a dangerous or defective condition has been created, no further proof is needed to charge the city with notice of that condition and the statutory requirement under the Public Liability Act that a city sought to be held responsible thereunder had notice has been met. (*Fackrell* v. *City of San Diego,* 26 Cal.2d 196, 203 [157 P.2d 625, 158 A.L.R. 625], and cases cited.) In the Fackrell case it was contended that, conceding the foregoing rule, there was nothing in that case about the street or sidewalk involved as originally completed that was inherently dangerous, but that on the contrary they were then safe and

remained safe for some weeks; that an inherent danger is one that exists from the beginning as distinguished from one which should be merely anticipated. The court held otherwise and declared that a public street need not be immediately dangerous in order that it be inherently dangerous and that if the improvement be designed to be used without inspection and under varying conditions normally to be anticipated, the improvements should be made reasonably safe for ordinary use under all of those conditions; further, that the defect and danger are no less inherent merely because the anticipated conditions which activate such defect and danger are to be present only occasionally. Said the court, at pages 206-207:

". . . Actual notice of a defective or dangerous condition is not required. Constructive notice satisfies the statutes. . . . Constructive notice is defined by section 19 of the Civil Code as that knowledge of circumstances 'sufficient to put a prudent man upon inquiry as to a particular fact' where 'by prosecuting such inquiry, he might have learned such fact.' The rules governing constructive notice require reasonable diligence in making inspections for the discovery of unsafe or defective conditions. . . . Where the authorities who have planned and constructed an improvement have knowledge of circumstances which reasonably might be expected to result in a dangerous condition as a natural and probable consequence of the work, such authorities are put upon inquiry, and it follows that it is incumbent upon them to make inspections commensurate in scope with the nature and character of their knowledge and the peril which should be avoided.

"As to what constitutes a dangerous or defective condition no hard-and-fast rule can be laid down, but each case must depend upon its own facts. . . . Whether a given set of circumstances creates a dangerous or defective condition is primarily a question of fact. . . . All legitimate and reasonable inferences must be indulged toward upholding the findings. [Here we must indulge the same inferences in determining whether or not a verdict in favor of respondent would have been supported by the record.] Appellate courts, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical."

We think this case is governed by the rules declared

in the Fackrell decision and that, applying those rules to the facts shown here, the order of the trial court appealed from must be affirmed. It is true that when, back in 1905, the terra cotta gravity sewer line was installed, it may be assumed to have been adequate for its purposes. But from the time of its installation to the time of respondent's injury the city had known at all times that it was not intended to operate under pressure nor designed to meet such a requirement. We must here take the testimony of respondent's engineer to the foregoing effect. We must also take that testimony as stating the truth when the engineer said that if sewage were pumped through that line at that intersection under pressure to the extent testified to, a break in the line was reasonably to be expected. We may assume that when in 1929 and under the conditions then obtaining as to volume of sewage disposal from the area served by the concrete line the sump and pumps were installed there was no immediate danger in pumping the collected sewage into the terra cotta line. But when the changed conditions in the area served by the two lines brought about a situation where the sewage was being pumped through the terra cotta line under pressure and under varying pressure, as the evidence showed, then a situation arose whereunder the general design became, to the knowledge of the city, inherently dangerous in that washing out the material underlying the surface of the intersection was to be reasonably expected. Under such a situation the principles declared in the Fackell case come into play. For it can make no difference whether an inherently dangerous condition is present when the improvement is completed according to plan, or whether that inherently dangerous situation arises through change of circumstances which, to the knowledge of the city, renders the design unfit for the continued use being made of the improvement. It is not unreasonable to charge responsible officials of a city with knowledge that conditions have so changed, and that an originally safe plan of improvement has become an inherently dangerous one. In view of the foregoing, we hold that the order of the trial court granting a new trial as to all issues ought not to be disturbed. What we have heretofore said effectually disposes of all matters before the court.

The order appealed from is affirmed. The cross-appeal is dismissed.

Adams, P. J., and Schottky, J. pro tem., concurred.