[Civ. No. 8643.   Third Dist.   Feb. 7, 1956.]

CARL SELBY et al., Appellants, v. COUNTY OF
SACRAMENTO et al., Respondents.

James H. Phillips for Appellants.

J. Francis O'Shea, District Attorney, Russell A. Harris and Floyd H. Pettit for Respondents.

PEEK, J.—By their action plaintiffs sought damages for the loss of 18 horses. At the conclusion of their case, defendants' motion for nonsuit was granted, and this appeal followed the judgment which was subsequently therein entered.

Plaintiffs' original complaint alleged that the individually named defendants were the duly elected supervisors of the county of Sacramento; that the defendant county owned, operated and maintained a sewage maintenance district; that a sewage line of that district ran through pasture land owned by plaintiffs' lessor, upon which plaintiffs pastured horses; that defendants acting through their agents and employees, cut a hole in said sewage line thereby permitting sewage to escape and spread over the leased property; that as a result thereof the water and forage became contaminated and poisonous to horses; that as a proximate result of defendants' permitting the sewage to escape and spread over said land, the horses ate and drank the contaminated and poisoned forage and water, became ill and died; that at the time of so opening the sewer line defendants knew that horses were in the pasture and that sewage was dangerous and poisonous to them; and that plaintiffs had duly filed their claim for damages with said county as required by law and the same was rejected.

Defendants' answer admitted the cutting of the hole as alleged, but affirmatively alleged the same was an emergency measure; denied that sewage was discharged on the land; denied that the deaths of the horses were proximately caused by the eating and drinking of contaminated forage and water or that it was dangerous to them; and denied knowledge of the horses using the land for pasturage. Defendants' answer further admitted the filing of the claim as alleged. Upon the issues so joined, the cause proceeded to trial. During the course thereof the court, at its own suggestion and over defendants' objection, granted plaintiffs leave to amend their complaint by inserting in paragraph XI thereof the pertinent portions of Government Code, section 1953.

The evidence, viewed in the light most favorable to plaintiffs (*Bridges* v. *County of Los Angeles,* 131 Cal.App.2d 151 [280 P.2d 76]), shows that for more than five years prior to the acts in question, plaintiff Selby had pastured horses on the property and that the plaintiff Gregory pastured a mare and a colt on the same land. When the horses in question were observed by plaintiffs on December 23 and 26, they appeared to be in good condition. On the evening of the later date, plaintiffs noticed sewage on a portion of the land. It came from a hole cut in a concrete pipe by employees of the defendant district, thence spread over the banks of a ditch which had been dug across the land. Neither plaintiff had notice that the ditch was to be dug or that the hole was to be cut in the line. The following day Selby called the county executive officer and informed him of the condition. On the 28th plaintiffs noticed that some of the horses were sick. On the 29th Gregory's mare died, and thereafter 18 horses either died or were destroyed within a week or 10 days of becoming sick. All of the horses exhibited the same symptoms.

On December 30 employees of the sewage maintenance district were observed with shovels placing more dirt on the sides of the ditch where the sewage was overflowing. However, this did not prevent the sewage, after it reached the end of the ditch, from spreading out over the ground and settling in low places in the pasturage. Where the sewage so spread over the grass, it left a foam 4 to 6 inches high which, when dry, formed a sheet somewhat like a thick piece of cardboard. Three or four weeks later the county built a fence around the ditch and the area where the sewage had spread over the ground. About a month later Selby put 12 horses back in

the pasture and none became sick. Witnesses who pastured horses on adjacent land, some of which were thoroughbreds, testified to having so used the land for several years, and although there was star thistle on their land, as there was on the pasturage of plaintiffs, none of their horses had ever had the symptoms which caused the deaths of the Selby horses.

The county engineer testified that four days prior to the time the pipe was cut, he had explored the property and had decided that should storm conditions continue and the city of Sacramento refuse to take district sewage through the city line, then it would be necessary to relieve the district line by cutting a hole therein and carrying sewage over the land in question by means of a ditch; that he knew that sewage would create bacteria from which diseases could be contracted; that he saw horses in the field but made no attempt to ascertain who owned them; and that he knew the owner of the land (a well-known Sacramento realtor and property owner) but was unable to contact him. The county sanitation officer also testified to bacteria in sewage.

Two veterinarians testified concerning star thistle disease and botulism poisoning, stating that the symptoms of the two diseases are somewhat similar, but their opinions that the cause of the horses' deaths was star thistle poisoning were neither uniform nor definite. One doctor stated that in his opinion star thistle disease was the cause. The other stated his opinion was given with the reservation that sewage could be a factor in rendering the star thistle toxic; however, they both testified that sewage was a suitable medium for the growth of the botulism organism which causes a toxic poisoning in animals; that the speed with which botulism affects an animal depends upon the severity of the attack and varies from a few hours to as much as two weeks; that botulism will cause death in horses in a much shorter period than will star thistle disease. One doctor testified that star thistle will affect an occasional animal but that here there were too many horses involved in the outbreak to attribute the deaths to star thistle poisoning; that a minute quantity of the botulism organism would cause death, but that it would take tons of star thistle to cause death; that when they first saw the animals they thought that the sewage might be a factor. One doctor testified that he was unable to say whether it was star thistle disease or botulism poisoning. Both of the veterinarians

testified that their opinions could have been influenced by a prior autopsy performed December 11 by another veterinarian on a horse owned by Selby, wherein the disease had been diagnosed as star thistle poisoning.

At the outset of the trial, and immediately following the opening statement of counsel for plaintiffs, defendants moved for a judgment of nonsuit and dismissal upon the grounds that the court lacked jurisdiction for the reason that the county, in disposing of sewage, was acting for the protection of the public health and welfare, a strictly governmental function, and hence enjoyed immunity from tort liability which it had not waived; and secondly, that the action was not based upon the Public Liability Act nor upon the theory that plaintiffs' damage in any way resulted from a dangerous or defective condition of public property. Defendants' motion was taken under consideration and the cause proceeded to trial. At the conclusion of the second day of trial, the court suggested that plaintiffs' complaint, to come within the Public Liability Act, should in so many words allege a dangerous and defective condition; that there should be a further allegation of notice and knowledge on the part of the county; and it should also allege that there was a failure to correct the dangerous condition after knowledge. Thereafter plaintiffs, in accordance with the suggestion of the court, were allowed to amend, over the objection of defendants' counsel. At the conclusion of plaintiffs' case, defendants again moved for a nonsuit, and the motion was granted upon the ground that ". . . the evidence offered by plaintiffs and each of them was insufficient as a matter of law to establish the liability of defendants or any of them."

Section 53051 of the Government Code provides that:

"A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition:

"(a) Had knowledge or notice of the defective or dangerous condition.

"(b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

In compliance with the statutory requirements of that section, plaintiffs alleged the creation by the county of a

dangerous condition in public property, the cutting of the sewer pipe, knowledge of the dangerous condition, failure to protect them from that condition, and their resulting damage. There can be no question but that the sewage line and ditch were public works and hence public property within the meaning of section 53050 of the Government Code. (*Bauer* v. *County of Ventura*, 45 Cal.2d 276 [289 P.2d 1].)

 As previously noted, responsive to the allegations of their complaint, plaintiffs introduced testimony by the county engineer that because of heavy rains, he anticipated that the city of Sacramento might terminate the county's use of the city's sewage lines; that four days prior to the actual cutting of the pipe, he had surveyed the field, had seen horses there, made no attempt to ascertain who owned them and decided to dig the ditch and open the sewage line if the city shut off the county's use of that outlet. He further testified that he knew that sewage could create bacteria and that certain diseases could be contracted from sewage. The county sanitation officer testified that botulism-producing bacteria can be found in sewage, as did the two veterinarians.

The work was conceived by and carried out in accordance with previous plans of the defendants, and hence, having been so created and carried out by them, no further notice of the condition created thereby was needed to bring to the defendants knowledge of the dangerous condition they themselves had so created. (*McAtee* v. *City of Marysville*, 111 Cal. App.2d 507, 511 [244 P.2d 936].) "Whether a given set of circumstances creates a dangerous or defective condition [in public property] is primarily a question of fact." (*Fackrell* v. *City of San Diego*, 26 Cal.2d 196, 206 [157 P.2d 625, 158 P.2d 773].)

 The same rule would apply even assuming, as defendants contend, that the situation presented was an emergency since ". . . the principles of nonliability and *damnum absque injuria* are not applicable when, in the exercise of the police power, private, personal and property rights are interfered with, injured, or impaired in a manner or by a means, or to an extent that is not reasonably necessary to serve a public purpose for the general welfare." (*House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384, 392 [153 P.2d 950].) Necessarily then, whether the damage suffered by plaintiffs exceeded the necessities of the case, likewise was a question of fact for determination by the jury.

In discussing the final question, it would appear unnecessary to again summarize the evidence produced by plaintiffs. It is sufficient to note that the evidence so summarized would sustain a finding that a condition dangerous to animals was knowingly created on public property by the county; that it failed to take any action to protect the public against the condition and thereby proximately caused the deaths of the plaintiffs' horses.

■ Although we have concluded that plaintiffs' cause as against the county of Sacramento under section 53051, should have been submitted to the jury, that is not to say that the judgment of nonsuit as to the individually named defendant supervisors was not correct. The only theory under which plaintiffs could have proceeded against the board members personally was in accordance with the provisions of Government Code, section 1953, which provides that *all* of the following elements must appear:

''(a) The injury sustained was the direct and proximate result of such defective or dangerous condition.

''(b) The officer had notice of such defective or dangerous condition or such defective or dangerous condition was directly attributable to work done by him, or under his direction, in a negligent, careless or unworkmanlike manner.

''(c) He had authority and it was his duty to remedy such condition at the expense of the State or of a political subdivision thereof and that funds for that purpose were immediately available to him.

''(d) Within a reasonable time after receiving such notice and being able to remedy such condition, he failed so to do, or failed to take reasonable steps to give adequate warning of such condition.

''(e) The damage or injury was sustained while such public property was being carefully used, and due care was being exercised to avoid the danger due to such condition.''

Even assuming that the complaint was sufficient as against the individual members of the board, there is no showing that the condition was directly attributable to work done by any defendant individually or under his direction, that he had authority and that it was his duty to remedy such condition, or that funds were immediately available to him for that purpose as provided in said section. It necessarily follows that the judgment of nonsuit must be affirmed as to the board members.

The judgment as regards the individually named defendant

members of the board of supervisors is affirmed. The judgment as regards the defendant county of Sacramento is reversed.

Van Dyke, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied February 28, 1956, and the petition of respondent County of Sacramento for a hearing by the Supreme Court was denied March 28, 1956.