[Civ. No. 22030.   Second Dist., Div. Two.   Apr. 8, 1957.]

WARD CONCRETE PRODUCTS COMPANY (a Corporation), Respondent, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT, Appellant.

Harold W. Kennedy, County Counsel, and Lloyd S. Davis, Deputy County Counsel, for Appellant.

Pat A. McCormick, Benjamin S. Parks and Floyd H. Norris for Respondent.

FOX, J.—This is an appeal from a judgment awarding damages against defendant Los Angeles County Flood Control District,[1] for injury to plaintiff's property caused by the overflow of surface waters.

Plaintiff is the lessee of improved real property on which it operates a plant for the manufacture of concrete building blocks. The finished blocks were stacked or stored on the premises. On the northern side of plaintiff's property, a street called Hyde Park Boulevard runs in an east-west direction, and then changes its course to proceed in a north-south direction along the western perimeter of plaintiff's premises. Adjacent to the south side of plaintiff's property and sloping in a generally western direction is a watercourse known as Centinela Creek, which, apart from occasional drainage of wastewaters from nearby streets, is normally dry, except during storm periods. In 1949 and in 1952, plaintiff's property was inundated during the rainy season by waters overflowing the banks of Centinela Creek. Plaintiff reported these incidents to the authorities of the city of Inglewood.

In 1952, the electorate authorized a bond issue to finance the construction of a storm drain for the purpose of controlling the flood waters of Centinela Creek. Defendant brought a condemnation proceeding for the acquisition of rights of way for the proposed drain. In the course of this action, defendant acquired a flood control easement across

---

[1]Plaintiff's action against two other defendants, the county of Los Angeles and the city of Inglewood, was dismissed.

the land occupied by plaintiff, pursuant to a judgment by stipulation of plaintiff and its lessor. No compensation other than the construction of the storm drain was provided for in the stipulated judgment.

The Centinela storm drain was designated as Project 273 and was constructed by defendant Los Angeles County Flood Control District late in 1953 on an alignment approximately following the natural channel of Centinela Creek. The portion of the drain bordering plaintiff's property consisted of a box-type concrete enclosure whose internal dimensions were a width of 12 feet and a height of 6 feet 6 inches. Its designed capacity was 1,230 cubic feet per second. The horizontal top of the drain, which ran parallel to the ground, was several feet above the level of plaintiff's property.

As a part of the overall drainage program, defendant contemplated the construction of a storm drain to be known as the Hyde Park Drain (Project 271), which was scheduled to commence eight months after completion of the Centinela Creek Storm Drain (Project 273). In order to provide a future connection between the Centinela Creek and Hyde Park storm drains, defendant constructed a junction structure or chamber some 500 feet to the east of plaintiff's property. The junction structure was of a box-type design with a rounded open end, facing to the north and having a diameter of 78 inches. It was erected at a point where the Centinela Creek storm drain intersected and faced an open ditch. This ditch, commonly known as the Hyde Park Drain, was north of the open end or inlet to the junction structure and in the past had carried the storm waters from the Hyde Park watershed into Centinela Creek.

In the middle of September, 1953, Mr. Pebbles, a representative of the city of Inglewood, communicated with H. E. Hedger, defendant's Chief Engineer, about his concern that the junction chamber "will clog with trash this winter." According to defendant's memorandum of the conversation, Hedger "[r]eminded him we were building 273 as designed by and for the City of Inglewood, but nevertheless agreed to have a check made to see if a temporary trash rack should be installed." On November 25, 1953, a metal grill, somewhat resembling the bars of a prison cell, was installed over the opening to the junction structure. The grating consisted of a series of vertical one-inch iron pipes spaced about 7 inches apart and held together by three horizontal bars. The grate, apparently a temporary expedient, was fastened

over the 78-inch opening with iron bolts. Neither Project 273 nor Project 271 included any grate over the opening in the original construction plans. Its installation was authorized by the defendant, presumably at the request of the city of Inglewood, for the purpose of blocking the entrance of large pieces of debris carried by floodwaters, and apparently also in furtherance of a general policy to safeguard against persons being swept into the drain.

In January, 1954, Inglewood was subjected to a rainstorm of moderate intensity. The waters flowing into the Hyde Park drainage area were filled with debris, some of which was pinned against the grating and blocked the entrance of the waters. As a result, the waters overflowed the banks of the ditch, and as they flowed westward along the north side of the Centinela Creek drain, they traversed plaintiff's property and caused minor damage. Plaintiff wrote defendant a letter of complaint and asked that remedial action be taken. Defendant also received other complaints. A crew was dispatched after the storm and the accumulated debris blocking the entrance was cleaned out. Mr. Dusenka, defendant's construction superintendent, admitted that the grating presented a hazard to the free flow of water into the drain. On February 13, 1954, a heavy storm broke over Inglewood, sending large amounts of water into the Centinela and Hyde Park drainage areas. Defendant assigned a group of men to the junction structure to remove debris as it accumulated against the face of the grating. In the early stages, this crew managed to cope successfully with the job of keeping the grate clear. However, before noon, there occurred an upsurge of debris-laden water which pressed large quantities of flotsam against the grate. The workmen were unable to handle its removal and as the debris piled up in front of the grate the passage of water was impeded. As a result, the waters poured over the top of the junction structure and over the banks of the ditch, flooding plaintiff's land to a depth of several feet. As a result of the overflowing of the water, many thousands of concrete blocks were damaged and considerable sums were expended by plaintiff in cleaning up the premises.

Two days after plaintiff's land was flooded, defendant ordered the grating removed. Mr. Dusenka testified this was done "[t]o avoid a repetition of what happened there on the 13th." He stated it was decided in his office that "if we couldn't keep the debris off the grate . . . we thought the

best thing is to take the grate off." The grating remained off for the rest of the season and was never reaffixed.

There was a conflict in testimony as to what part the existing storm drain had played in causing plaintiff's property to be flooded. Plaintiff's expert, Mr. Shields, testified that had the waters not been prevented from entering the junction structure opening by virtue of the accumulation of debris on the grating, the flooding would not have occurred. He testified that the effect of the installation of the grate was to create a "man-made dam." Defendant's witnesses testified there was twice as much water flowing in the Hyde Park ditch as could have entered the Centinela drain even if no blockage by debris had occurred. They testified that because of the quantity of water flowing, plaintiff's premises would have been inundated to almost the extent of the maximum high-water level even if no drain had been constructed.

The trial court found in favor of plaintiff and awarded judgment for the damage sustained.

Plaintiff does not suggest that liability should be fastened on defendant on account of mere negligent operations on the part of its employees. It contends, in harmony with *Bauer* v. *County of Ventura,* 45 Cal.2d 276, 286 [289 P.2d 1], that the obstruction caused by the grating was a part of the construction or maintenance plan adopted by defendant, for which liability attaches when, as a result, a taking or damaging of private property for public use occurs. Thus the gravamen of plaintiff's action, as embodied in its pleadings and propounded during the trial, is predicated on the theory of inverse condemnation, which derives from article I, section 14 of the California Constitution.[2] "The construction of the public improvement is a deliberate action of the state or its agency in furtherance of public purposes. If private property is damaged thereby the state or its agency must compensate the owner therefor [citations], whether the damage was intentional or the result of negligence on the part of the governmental agency [citations]." (*Clement* v. *State Reclamation Board,* 35 Cal.2d 628, 641 [220 P.2d 897].)

It is plaintiff's position that defendant, during the construction of the storm drains, negligently installed and maintained a grating at the inlet to a storm drain, causing said

---

[2]That section provides in part: "Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner. . . ." It will be observed the constitution applies to a damaging as well as a taking.

inlet to become clogged with debris; that as a result of such blockages, waters which normally would flow into the inlet could not move along their natural course, accumulated in front of the grating and were diverted into an overflow over plaintiff's land; that this interference with the free flow of waters resulted in damage to plaintiff's land which otherwise would not have occurred.

It is plain that the evidence adduced fully sustains plaintiff's position and that the trial court correctly based its judgment on the conclusion that the acts of the defendant constituted a taking or damaging of private property for public use for which just compensation is compelled under article I, section 14, of the Constitution of the State of California. To recapitulate the essential facts, we find that at the time of the original condemnation action, the construction plans for the storm drain did not provide for a grating to be installed and the judgment in that proceeding was made with reference to the plans and specifications as then furnished by the public agency. After Project 273 was completed in accordance with the original plans, an official of the city of Inglewood discussed with defendant the problem of keeping debris out of the storm drain. Defendant's chief engineer stated that he would investigate the problem "to see if a temporary trash rack should be installed." Some two months later, the grating in question was erected. In January, 1954, the inadequacy of this structure to cope with the debris problem became evident during a rainstorm of only moderate intensity, when the accumulation of debris against the grating caused water to overflow plaintiff's property. Plaintiff complained to defendant of the minor damage it then sustained. Defendant took no remedial action. A month later, during a heavier rainstorm, the prior experience was duplicated, this time on a larger scale. The grating became blocked by debris, denying entrance of the water to the junction chamber inlet. As a result, the waters backed up, broke loose over the banks of the ditch and flooded plaintiff's land to a depth of several feet. Thereafter, defendant removed, and never restored, the offending barrier.

With this factual context established, plaintiff's right to recovery is clearly supported by the recent case of *Bauer* v. *County of Ventura*, 45 Cal.2d 276 [289 P.2d 1]. In that case, the action was for damages to property caused by the overflow of water from a ditch constructed by defendant county and a storm maintenance district. The damage to plaintiff's prop-

erty resulted from the raising of the ditch banks, the placing of a pipe across the ditch and the collection of debris and stumps in the ditch which raised an obstruction and caused the water to back up on plaintiff's land. Previously, overflowing waters had rained downward and away from plaintiff's property. In reversing a dismissal as to the defendant county, the court expressed the controlling principle in these terms (p. 285) : "It follows that the taking or damaging of private property for the maintenance of an existing public improvement involving a deliberate act which has as its object the direct or indirect accomplishment of the purpose of the improvement as a whole constitutes a taking or damaging of property for a public use and the owner of such property is entitled to compensation." Applying this principle to the facts before it, and in determining that the damage sustained was within the purview of article I, section 14 of the California Constitution, the court stated (p. 286) : "But the raising of a ditch bank appears on its face to be a deliberate act carrying with it the purpose of fulfilling one or another of the public objects of the project as a whole. Here the raising of the bank is not an accident or an act in itself resulting from carelessness. It is deliberate. The damage to property in this instance resulted not from immediate carelessness but from a failure to appreciate the probability that, functioning as deliberately conceived, the public improvement as altered and maintained would result in some damage to private property . . .

"The plaintiffs, as stated, also allege that the collection of debris and stumps in the ditch raised an obstruction which caused the water to back up on their land. If this was due to the mere negligent operation of the ditch system, it is not within the scope of liability as a taking or damaging for a public use under section 14. If, on the other hand, the obstruction of the ditch was in some way part of the plan of maintenance or construction, then liability would attach because the means of carrying out the plan of construction and maintenance are immaterial. [Citations.] The allegations in the complaint in the present case make the plaintiffs' theory clear. They allege that the collection of debris and stumps was part of the construction and that the taking was for a public use. The presence of debris and stumps was therefore properly characterized to bring it within the scope of section 14."

This analysis of compensable damage within the meaning

of section 14 applies with equal validity to the case at bar. The installation of the grating was a deliberate act adopted primarily for the purpose of fulfilling the object of the project as a whole and the damage to plaintiff's property resulted from defendant's failure to appreciate the probability that, functioning as deliberately conceived, the alteration in the public improvement would result in damage to private property. As the evidence shows, the water was impounded by the debris which accumulated in front of the grating. In the words of Mr. Shields, there was thus created a "man-made dam," the grating having dammed up the inlet and impeded the flow of water, which consequently spilled over the banks of the ditch and inundated plaintiff's property. ■ Giving full weight to the effect of plaintiff's testimony, the inference reasonably to be drawn is that but for the installation of the grating, which interfered with and diverted the natural flow of water so that it was discharged over plaintiff's land, the resultant damage would not have occurred. This evidence is sufficient to sustain the trial court's conclusion that the installation of the grating directly caused the damage and that it was a "damaging" without compensation within the meaning of our Constitution.

■ Relying on such cases as *O'Hara* v. *Los Angeles County Flood etc. Dist.*, 19 Cal.2d 61 [119 P.2d 23], and *Archer* v. *City of Los Angeles*, 19 Cal.2d 19 [119 P.2d 1], defendant seeks to escape liability by asserting that the installation of the grate was a valid exercise of police power by a governmental agency, since the grating would prevent persons trapped in flood waters from being swept into the drains. This argument loses its force in the light of the evidence that the immediate, primary and actuating reason for the installation of the grate was to serve as a "trash rack" to collect debris, and it was its functioning in this very manner which caused the damage here complained of. Thereafter, defendant removed the grating permanently. Clearly, this suggests that it was experimenting as to the efficacy of the grating as a debris-control mechanism rather than as furthering any police power function. Furthermore, since the decisions in the cases cited, the Supreme Court has given further consideration to this latter subject matter (police power) in *Bacich* v. *Board of Control*, 23 Cal.2d 343, 351 [144 P.2d 818], and *House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384, 391 [153 P.2d 950]. ■ Those cases indicate that, in the absence of any compelling emergency or the pressure of public neces-

sity, the courts will be slow to invoke the doctrine of police power to protect public agencies in those cases where damage to private parties can be averted by proper construction and proper precautions in the first instance. (See also *Veterans' Welfare Board* v. *City of Oakland,* 74 Cal.App. 2d 818, 831 [169 P.2d 1000].) As stated in the House case, *supra:* "It is a principle of universal law that wherever the right to own property is recognized in a free government, practically all other rights become worthless if the government possesses an uncontrollable power over the property of the citizen. Upon this premise the plaintiff relies on the *unnecessary* damage to her property as the result of the defendant district's negligence in the planning, construction and maintenance of the flood channel work to sustain the constitutional basis of her claim. In other words, it is her position that damage suffered by a property owner as the result of a public improvement undertaken in the exercise of the police power must have some reasonable relation to the purpose to be accomplished under the prevailing circumstances, and that the governmental agency proceeding with such work may not *needlessly* inflict injury upon private property without being liable to make compensation therefor. This accords with the general object of the constitutional guaranties in protection of property rights and but places upon a reciprocal basis the individual's damage in relation to the public benefit. *Unnecessary* damage to his property is of no benefit to the public; rather it only entails unwarranted sacrifice and loss on the individual's part, which should be compensable damage." ■ Whether the damage suffered by plaintiff exceeded the necessities of the case as expounded in the House case was a question of fact for determination by the court. (*Selby* v. *County of Sacramento,* 139 Cal.App. 2d 94, 99 [294 P.2d 508].) Having resolved this issue against defendant on the basis of the evidence previously alluded to, defendant may not avoid the payment of compensation under the police power.

■ Defendant concedes that the judgment in the prior eminent domain proceeding does not bar recovery for such damage as was caused by the installation of the grating, since this was not provided for in the original plans. (*People ex rel. Dept. P. W.* v. *Schultz Co.,* 123 Cal.App.2d 925, 935, 936 [268 P.2d 117].) It argues, however, that its liability should have been limited to no more than the difference between the damage which occurred and that which would have oc-

curred if the grating had not been in place. The evidence on this point was in substantial conflict. It is true that defendant produced evidence indicating that because of the volume of water flowing, the inlet would have been inadequate to accommodate the amount of water flowing during the height of the storm and that some flooding of plaintiff's land would have occurred even without the obstruction produced by the grating. Mr. Shields, on the other hand, testified that in his opinion there would have been no inundation of plaintiff's property but for the installation of the storm drain and further testified that the installation of the grate created a "manmade dam" which caused the impounded waters to flood plaintiff's land. In the light of this testimony, we are unable to say that the determination of the court finds no adequate support in the evidence. As stated in a similar context in *Clement* v. *State Reclamation Board,* 35 Cal.2d 628 [220 P.2d 897], where the evidence was conflicting as to the quantity of water dumped on plaintiff's land caused by a cutting of levees (p. 641) : "The resolution of the conflict must be made by the trier of fact and not by this court on appeal [citations]."

The judgment is affirmed.

Moore, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied May 2, 1957, and appellant's petition for a hearing by the Supreme Court was denied June 4, 1957. Traynor, J., was of the opinion that the petition should be granted.