[Civ. No. 5920. Third Appellate District.—January 31, 1938.]

DAN E. WILLIAMS et al., Appellants, v. CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation), Respondent.

Charles F. Blackstock, Andrew R. Schottky and Glenn J. Fairbrook for Appellants.

John J. O'Toole, City Attorney, Dion R. Holm, Assistant City Attorney, and A. E. Chandler for Respondent.

THOMPSON, J.—The plaintiffs have appealed from a judgment on the pleadings which was rendered against them. The complaint is couched in two counts. The first cause of action is a simple suit to quiet title to several tracts of land in Tuolumne County owned and possessed by the respective plaintiffs. The second cause of action alleges that these tracts of land border on the Tuolumne River from which for many years the plaintiffs have appropriated and used the waters to irrigate their respective tracts and for domestic purposes, which water rights thus acquired they also seek to have quieted; that the defendant has constructed dams and works above the lands of plaintiffs, and has thereby diverted and threatens to continue to divert the waters of that river from its natural channel and from the lands of plaintiffs to their irreparable damage. In this second cause of action the plaintiffs seek injunctive relief to prevent the defendant from continuing to divert the waters from the Tuolumne River and from their lands. It appears from an exhibit attached to the complaint that plaintiffs' lands were originally acquired as placer mining claims. The several tracts are specifically de-

scribed, but neither the sources of their titles nor the dates when they were acquired appear in that pleading.

In an elaborate answer the essential allegations of the complaint are denied. It is alleged the defendant is a municipal corporation which, in the name of the Hetch Hetchy project, has, for many years, appropriated and used, under the authorization of the Raker Act, large quantities of water from the Tuolumne River and adjacent streams to supply the inhabitants of San Francisco with water for domestic purposes and for hydro-electric power. The manner of acquiring its water rights, together with the approximate quantity used and the cost of constructing and maintaining its dams, reservoirs, power-houses, works and equipment are specifically alleged. The answer then denies that the defendant has wrongfully diverted or that it intends to divert or use any of the waters of the Tuolumne River necessary for beneficial purposes on the plaintiffs' land; that because of plaintiffs' knowledge and acquiescence in defendant's appropriation and use of the waters of that river for many years past they are now estopped from denying its title thereto. It is asserted the defendant has thereby acquired title to the water thus diverted by adverse possession; that this action is barred by the provisions of sections 318, 319 and 338 of the Code of Civil Procedure, and by section 1007 of the Civil Code, and by article II, chapter II, section 8, of the charter of San Francisco.

Upon motion of the defendant, judgment on the pleadings was rendered against the plaintiffs to the effect that they take nothing by their action. This judgment was granted on the theory that the court will take judicial notice of the records of the United States land office which discloses the fact that plaintiffs acquired title to their respective tracts of land by patents from the government which were issued to them subsequent to March 3, 1877, when the Desert Land Act was enacted, by the terms of which all water rights were reserved in the federal government, and that plaintiffs therefore acquired no title to the waters of Tuolumne River as riparian owners of land adjacent thereto or otherwise.

Two questions are presented on this appeal: First, on a motion for judgment on the pleadings, as distinguished from a trial on the merits of a cause, may the court take judicial notice of the patents issued by the United States land office to supply the dates and sources of title so as to defeat an

otherwise adequate statement of a good cause of action to quiet title to real property? Second, do conveyances of lands from the government subsequent to the enactment of the Desert Land Act of March 3, 1877, preclude the owners thereof from acquiring riparian water rights incident to the lands in an arid land district under constitutional provisions and statutes existing in such jurisdictions with relation thereto?

We are of the opinion the complaint states good causes of action both to quiet title to the real property and to alleged water rights incident thereto, and that the court therefore erroneously rendered judgment on the pleadings against the plaintiffs without affording them the opportunity of a trial upon the issues tendered.

The cause of action based upon a suit to quiet title to the real property is couched in the usual language which has been approved in innumerable authorities. Certainly that count states a good cause with respect to the title of the land irrespective of the water rights incident thereto. In an ordinary suit to quiet title it is sufficient for the plaintiff to allege in simple language that he is the owner and in possession of the land and that the defendant claims an interest therein adverse to him. (22 Cal. Jur. 146, sec. 28; 17 Cal. Jur. 524, sec. 168.) In such a suit the plaintiff is entitled to prove not only that he holds the record title to the property, but also that he acquired title by adverse possession. In the case entitled *President & Pres. Elder, etc.,* v. *Goodwin,* 119 Cal. App. 37 [5 Pac. (2d) 973], it was held the court erred in confining plaintiff to proof of its record title to the real property and in rejecting its offer to prove title thereto by adverse possession.

Upon a motion for judgment on the pleadings, like a demurrer to a complaint, the allegations of the pleadings must ordinarily be accepted as true. (*Hibernia Savings & Loan Soc.* v. *Thornton,* 117 Cal. 481 [49 Pac. 573]; *Bates* v. *Escondido Union High School Dist.,* 133 Cal. App. 725 [24 Pac. (2d) 884].)

In determining on demurrer the sufficiency of the allegations of a complaint the court may take judicial notice of the official records of the United States land office affecting the title to land which is involved in the suit. (*Livermore* v. *Beal,* 18 Cal. App. (2d) 535, 540 [64 Pac. (2d) 987]; sec.

1875, subd. 3, Code Civ. Proc.) ▮▮ But assuming that the United States patents to the plaintiffs' lands conveyed no title to water rights incident thereto when they are issued subsequent to the enactment of the Desert Land Act of March 3, 1877, which we do not concede, the plaintiffs would still be entitled to have the title to their lands determined in this suit independently of their asserted water rights. Moreover, they would also be entitled to prove any water rights incident to such lands which they may have previously acquired by occupancy and possession of the land prior to the enactment of the Desert Land Act. Such rights are uniformly recognized.

▮▮ We are also satisfied the court erred in assuming from the mere inspection of certified copies of United States patents to plaintiffs' respective tracts of land, which appear to have been issued subsequent to the adoption of the Desert Land Act, March 3, 1877, with the exception of the plaintiff Louis Harris' land, that plaintiffs, since they took title to public lands in an arid land district after March 3, 1877, therefore possessed no riparian or other water rights incident to their lands and could acquire no water rights under the Constitution or statutes of California. The case of *California Oregon Power Co.* v. *Beaver Portland Cement Co. et al.,* 295 U. S. 142 [55 Sup. Ct. 725, 79 L. Ed. 1356], upon which the respondent relies, does not so hold. The plaintiffs are therefore entitled to prove at a trial of the issues of this case title to their real property and whatever riparian or other water rights they may have acquired. ▮▮ The Desert Land Act (U. S. C. A., title 43, p. 272, sec. 321), upon which the respondents rely, reads in part:

"It shall be lawful for any citizen of the United States . . . to file a declaration under oath with the register . . . of the land district in which any desert land is situated, that he intends to reclaim a tract of desert land not exceeding one-half section, by conducting water upon the same, within the period of three years thereafter: Provided, however, that the right to the use of water by the person so conducting the same, on or to any tract of desert land of three hundred and twenty acres shall depend upon *bona fide* prior appropriation; and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the

water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights. . . . ''

After a diversity of opinions in various jurisdictions regarding the effect of the Desert Land Act upon water rights incident to real property acquired from the federal government after March 3, 1877, the leading case of *California Oregon Power Co.* v. *Beaver Portland Cement Co., supra,* was decided by the Supreme Court of the United States in 1935, construing that act in its application to such water rights. From a careful reading of that opinion it seems clear the United States Supreme Court determines that the language of the Desert Land Act above quoted does not withhold or abrogate from conveyances of public lands in arid districts subsequent to March 3, 1877, the riparian or other water rights conferred by the provisions of Constitutions or statutes of the respective jurisdictions in which the land is situated. On the contrary, we are of the opinion the California Oregon Power Company case holds that by conveying from the federal government public lands in an arid district after March 3, 1877, it is implied that the grantee shall take title to the real property and to such water rights incident thereto as may be recognized and conferred by local laws, customs, and judicial decisions of the jurisdictions in which the lands are situated.

In the case last mentioned, the petitioner, which is a public service corporation, owned a tract of land bordering on the east side of Rogue River in Oregon. Its predecessor took title to the land under the Federal Homestead Act in 1885. On the west side of the Rogue River, opposite the petitioner's property, the respondent occupied land under a contract of purchase from the City of Gold Hill, which was the owner thereof. The title to the property of each litigant extended to the thread of the stream. Neither party to that suit had ever diverted or used water from the Rogue River for the benefit of their respective lands. Both parties claimed under the common law as riparian proprietors. The petitioner claimed its water rights attached to the land as a necessary part thereof when the patent to the homestead was issued from the government to its predecessor in 1885. The respondent was blasting out the bed of the river on its side of the stream to

clear the channel for a better flow of water and to obtain rock with which to construct a dam and other works for a power plant. The petitioner sought to enjoin the respondent from so doing on the ground, among others, that its acquired riparian water rights entitled it to have the surface of the river maintained at the normal elevation at which it was accustomed to flow over and upon its property.

It is difficult to determine just what riparian or appropriative water rights were recognized in Oregon prior to the adoption of its Water Code in 1909. (Stats. of Oregon, 1909, chap. 216.) That code definitely provides that all water within the state is subject to appropriation for beneficial use, except that all water rights previously vested are specifically preserved to the owners thereof. With respect to riparian rights the Oregon Water Code declares that vested rights shall be limited to ''an actual application of water to beneficial use prior to the passage of this act . . . to the extent of the actual application to beneficial use''. It will be observed the Supreme Court asserts with respect to those litigants that:

''Neither petitioner nor any of its predecessors in interest has ever diverted the water of the river for beneficial use on the real property or sought to make an actual appropriation thereof.''

The petitioner's riparian rights as declared by the provisions of the Oregon Water Code were therefore not invaded. Nevertheless, the lower court held:

'' (1) That the homestead patent of 1885 carried with it the common-law right to have the stream continue to flow in its accustomed channel, *without substantial diminution;* but (2) that, while this was a substantial property right which could not be arbitrarily destroyed, *it* nevertheless was subject to the police power of the state and *might be modified by legislation passed in the interest of the general welfare.*''

The Supreme Court therefore recognized the binding validity of the common-law riparian rights, although they were held to be subject to police power of the state of Oregon to modify that principle for the general welfare of the public. And so the validity of the Oregon Water Code was sustained, but the judgment of the lower court was affirmed and the respondent was enjoined from carrying out operations which would result in reducing the flow of Rogue River below its normal level. That decision is itself a recognition of the

validity of prior water rights vested under "customs, laws and judicial decisions of the state of their location".

In construing the application of the Desert Land Act to water rights of every nature incident to lands which were thereafter conveyed, the Supreme Court said that subject to prior vested water rights acquired by appropriation:

"As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. . . . The fair construction of the provision now under review is that Congress intended to establish the rule that for the future the land should be patented separately; and that all non-navigable waters thereon should be reserved for the use of the public *under the laws of the states and territories named.* . . . The only exception made is that in favor of *existing* rights; and the only rule spoken of is that of *appropriation.* It is hard to see how a more definite intention to sever the land and water could be evinced. The terms of the statute, thus construed, must be read into every patent thereafter issued, with the same force as though expressly incorporated therein, with the result that *the grantee will take the legal title to the land conveyed, and such title, and only such title, to the flowing waters thereon as shall be fixed or acknowledged by the customs, laws, and judicial decisions of the state of their location.*"

It may not be contended that congress has not delegated and conferred upon the legislatures of the various so-called arid states the power to fix and determine the grantee's water rights incident to land conveyed by the government under the Desert Land Act. In the sentence following the preceding quotation, the court said:

"If it be conceded that in the absence of federal legislation the state would be powerless to affect the riparian rights of the United States or its grantees, still *the authority of Congress to vest such power in the state, and that it has done so by the legislation to which we have referred, cannot be doubted.*"

There can be no question from the preceding quoted language of the Supreme Court but that the water rights of a grantee of arid land from the government carries with it the absolute authority of the state in which it is located to fix and determine the extent thereof by appropriate legislation,

or by acknowledgment of rules and customs with respect thereto. The court specifically says in that regard:

*"Nothing we have said is meant to suggest that the act,* as we construe it, *has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest."*

Finally, to foreclose the possibility of misconstruing the language of the opinion, the court says:

"What we hold is that following the act of 1877, if not before, all non-navigable waters then a part of the public domain became *publici juris, subject to the plenary control of the designated states,* including those since created out of the territories named, *with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain."*

It is therefore not true, as the respondent contends, that the appellants in this case possess no water rights incident to their lands merely because their titles were acquired from the government by patents issued subsequent to the adoption of the Desert Land Act. As the Supreme Court has definitely held, they may be entitled to any water rights which have been recognized and fixed "by the customs, laws and judicial decisions of the state" of California.

Riparian rights to the beneficial use of water upon lands in this state adjacent to rivers and streams have been recognized by law and are uniformly upheld by the California courts. (25 Cal. Jur., p. 1060, sec. 58 et seq.; art. XIV, sec. 3, Const. of Cal.; *Peabody* v. *City of Vallejo,* 2 Cal. (2d) 351 [40 Pac. (2d) 486]; *City of Los Angeles* v. *Aitken,* 10 Cal. App. (2d) 460, 472 [52 Pac. (2d) 585].) By the adoption of article XIV, section 3, of the Constitution in 1928, riparian rights are now limited to the "use or flow of water in or from any natural stream or water course in this state . . . to such water as shall be reasonably required for the beneficial use to be served. . . . *Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses;* provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or

of depriving any appropriator of water to which he is lawfully entitled."

In support of the doctrine that it has always been the policy of the United States to leave the vesting and control of private water rights to the several states in which the land is situated, it is said in the Peabody case, *supra*, at page 366:

"The attitude of the Supreme Court of the United States has been consistent in leaving the question of private water rights, which do not involve federal or interstate interests, to the control of local state policies."

Numerous federal cases to that point are cited.

We do not hesitate to say that uniform policy of the Supreme Court of the United States has not been changed by the adoption of the Desert Land Act in question, as is evidenced by the reiteration of that principle in the California-Oregon Power Company case, *supra*.

It follows that the appellants should have been given the opportunity to prove their titles to the respective tracts of land which they own irrespective of their water rights, and that they should also have been permitted to prove whatever water rights they may have acquired under the customs and laws of the state of California.

The judgment is reversed and the trial court is directed to proceed to trial at its convenience on the issues presented by the pleadings in this cause.

Plummer, J., and Pullen, P. J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 31, 1938.