PIERCE, J.
 

 These areappeals, in four consolidated inverse condemnation actions, from judgments of dismissal following the sustaining of demurrers without leave to amend.
 

 A whole generation has grown up since the origin of this controversy, initiated by the filing of claims by the four landowners with respondent board and the Board of Control in 1944. These claims were not acted on for three years. Then they were denied and in 1947 original complaints were filed. Amended complaints were filed in September 1952. (Unexplained is the inertia between 1947 and 1952.) Respondents demurred and the demurrers were sustained without leave to amend. Judgments were entered June 4, 1953. On denial of motions to vacate the judgments (upon grounds not here material) appeals were taken resulting in reversal of the orders by the Supreme Court.
 
 (Beckley
 
 v.
 
 Reclamation Board,
 
 48 Cal.2d 710 [312 P.2d 1098].) Amendments were then filed; demurrers were again sustained. New judgments of dismissal were entered on May 17, 1960, and these appeals followed. They have been consolidated for hearing, with the record in the
 
 BecMey
 
 case to be used as the basis of the appeals.
 

 The only question is whether the complaints state a cause of action in inverse condemnation under article I, section 14, of the California Constitution.
 

 The complaints plead that the lands of the plaintiffs are
 
 *737
 
 located downstream on the Sacramento River from the point of a spillway known as Moulton Weir, which weir is approximately 13 miles upstream from the City of Colusa. The Beckley lands are 4 miles downstream from the weir. These are the southernmost of the four parcels involved, all of which are in close proximity. All of the lands affected lie between the presently constructed river levees (on opposite sides of the river) and the thread of the stream. In other words, they are along the river banks and are unprotected by levees.
 

 The Beckley and Forry lands are on the east side of the river, the Erisey and Seaver lands are on the west side. Perhaps a clearer understanding of the controversy can be had when it is explained that more than an ordinary berm separates the river levees from the stream in this area, particularly in the case of the Forry and Beckley lands which lie in separate horseshoe-shaped bends of the river, with the levee running along the neck of the horseshoe, leaving large acreages (comparable in size to the entire City of Colusa) outside the levees and thus in an overflow area whenever the river rises above its natural banks.
 

 It is alleged that commencing about 75 years prior to the adoption of the Sacramento River Flood Control Project by the State, the “farmer-landowners” of the vicinity had constructed, with nature’s aid, their own “flood control system.” This consisted of the utilization of banks of the river naturally raised by alluvial deposits; and these banks were raised in elevation by the landowners themselves. Thereafter the lands were continuously maintained at their increased elevations all along both the east and west sides of the river on its course through Colusa County. It is further alleged that these raised banks came to be the “fixed, permanent, natural banks of the Sacramento River.” Also as a part of the system, these landowners are alleged to have provided an opening in the east bank of the river at a point known as the “Old Moulton Break” located about 4 miles north of the Beckley property. It is said that this opening “relieved the capacity of the stream of the Sacramento River at a certain flood stage by allowing natural stream waters from the natural channel of the Sacramento River to pass into another and secondary natural channel of the Sacramento River and thence through a natural channel in Butte Basin and thence onward and into the sea.” It is alleged that “this flood control system was adequate and did at all times protect the afore-described lands of plaintiff from the natural stream
 

 
 *738
 
 waters of the Sacramento River at flood stage and no damage had occurred to plaintiff’s lands by the waters of the Sacramento River prior to the construction by defendants of the Sacramento River Flood Control Project.”
 

 It is then alleged that the Sacramento and San Joaquin Drainage District, managed by the State Reclamation Board, formulated in 1925, and thereafter executed, a plan which destroyed and eliminated the old farmer-landowner flood control system and substituted therefor a new flood control system comprising a new system of river levees on both the east and west sides of the river commencing at Ord’s Ferry in Butte County and running through the whole of Colusa County. Also as a part of said works two artificial weirs were planned and built, one approximately at the opening in the east levee described above, a fixed crest spillway, called the Moulton Weir, which “closed the opening” to the height of the weir crest, the other, the Colusa Weir, located in the east levee about 2 miles north of Colusa. The complaint alleges that this new “flood control system would have the effect of creating a new artificial channel for the Sacramento River both upstream and downstream, of plaintiff’s property and would completely change the regimen of the stream.” It is further alleged that this new system was planned and constructed “in a grossly incompetent manner and contrary to good engineering practices”; that the works failed to make the artificial river channel of sufficient size to accommodate the augmented volume of waters, and they failed to construct the Moulton Weir of sufficient capacity to “accommodate natural waters of the Sacramento River in flood season. ’ ’ The result alleged to have accrued to plaintiffs is that the “waters, did for the first time in the history of Colusa County, overflow onto and inundate plaintiff’s lands to the extent that they were caused serious and permanent damage.” It is further alleged that no damage was occasioned the lands of plaintiffs until within two years of 1944 when their claims were filed.
 

 It is the theory of the Attorney General, representing defendants, that however clearly plaintiffs may have pleaded otherwise, this court must take judicial notice that all of the waters which are here alleged to have damaged plaintiffs are in fact “flood waters.” From this they syllogize that being flood waters they are the “common enemy” which any private owner may repel even though the effect of the repulsion be t,o shunt the waters onto his neighbor; that any attendant
 
 *739
 
 damage is
 
 damnum absque injuria.
 
 Then they invoke the rule that what the private individual may do without liability the state may do, and they reach the conclusion that the state, therefore, is not liable. We feel that defendants oversimplify the problem and by such oversimplification reach an unjustified conclusion.
 

 The history and general features of the Sacramento River Flood Control Project have been given full exposition in earlier decisions. (See:
 
 Gray
 
 v.
 
 Reclamation Dist. 1500,
 
 174 Cal. 622 [163 P. 1024];
 
 Miller & Lux, Inc.
 
 v.
 
 Sacramento & S. J. Drain. Dist.,
 
 182 Cal. 252, 254-256 [187 P. 1041];
 
 In re Sutter-Butte By-Pass Assessment No. 6,
 
 191 Cal. 650, 655-660 [218 P. 27];
 
 Reclamation Dist. 1500
 
 v.
 
 Riley,
 
 192 Cal. 147, 150-152 [218 P. 762];
 
 Sacramento & S. J. Drain. Dist.
 
 v.
 
 Johnson,
 
 192 Cal. 211, 216-218 [219 P. 442];
 
 American River Flood Control Dist.
 
 v.
 
 Sweet,
 
 214 Cal. 778, 781-782 [7 P.2d 1030];
 
 Clement
 
 v.
 
 State Reclamation Board,
 
 35 Cal.2d 628, 632-633 [226 P.2d 897].)
 

 The
 
 Gray
 
 case,
 
 supra,
 
 contains an excellent statement (by the author of the opinion, Justice Henshaw) of geological and topographical conditions on the Sacramento River and its tributaries, in a state of nature, the early history of hydraulic mining, farming and reclamation in the valley as related to problems of flood control and an outline of the original flood control plan. The opinion describes the silt-saturated river entering the valley, with the high gradient and velocity of flow arrested as the river meets the valley floor and the resultant gradual depositing of materials and building up of banks as flood waters “passed over them in slow-moving sheets.” And it shows the rivers moving “along the center of ridges of their own construction.” It describes the low-lying river basins beyond the higher banks and points out that while the height of the banks prevented the flooding of the lands along them, except during extremely wet years, the low-lying lands in the basins beyond experienced regularly-recurring annual floods from waters pouring into them “in low places and breaks through the banks, known as sloughs,” with well-defined channels feathering out “into nothingness as the sloughs poured their waters into the vast flat area of the basins ’ low lands. ’
 
 ’
 

 Having described the river in a state of nature, the opinion then recounts the increase in sedimentation in the river due to hydraulic mining and to the loosening of soil in the course of farming operations, stating that (at p. 629), “ [t]he im
 
 *740
 
 mense quantities of detritus brought down by the stream
 
 [1]
 
 13 raised enormously the bed of the river, necessarily lessened its depth, aggravated flood conditions,” and impaired the navigability of the river. It mentions the further aggravation of flood problems as an ever-increasing number of individual reclamation districts, acting with no coordinated plan, leveed off more and more areas previously subject to overflow, thereby causing flood waters to reach unreclaimed lands theretofore not subject to overflow. The chaos created by this unregulated dog-eat-dog reclamation and its resultant raising of the flood plane (under the protection of the “common enemy” doctrine hereafter to be examined) is graphically described in the opinion in
 
 In re Butter-Butte By-Pass Assessment No. 6, supra,
 
 at page 656, which includes the statement: “. . . The individual reclamation work would, therefore, develop into a contest between the landowners on each side of the river (each attempting to build his levee higher than those of the land owner on the opposite side). . . . Clearly, therefore, the only adequate method of preventing this result was the unification of the individualistic and antagonistic efforts .. . into one comprehensive co-ordinating plan. ...” The public action which such conditions engendered were these: The California Debris Commission, a federal body, organized in 1893, issued a report in 1910, after an exhaustive study and research advantaged by the data collected during the devastating floods of 1907 and 1909. (House Document 81, 62d Congress, 1st Session—called the Jackson Report.) This report was adopted by the California Legislature in 1911 as the Sacramento River Flood Control Plan. (Stats. 1911, Ex. Sess. ch. 25, § 1.) The plan embodied in this report is outlined in the
 
 Gray
 
 opinion. It adopts a “by-pass system” which contemplates the erection of river levees, the closing of sloughs, the deepening of the river channel so that the greatest scouring effect can be obtained—in aid of navigation. Artificial spillways or weirs are to be constructed at designated points to take excess waters from the rivers and these waters are to be carried down defined leveed channels in the basins known as “by-passes.” The opinion described the same Moulton’s Break with which we are here concerned, and the provisions of the
 
 *741
 
 plan for construction of a weir at or near the site of the break 14 miles above Colusa.
 

 In this respect the plan has been modified by a later report of the California Debris Commission (Senate Document 23, 69th Congress, 1st Session—called the Grant Report). It was adopted by the 1925 California Legislature as the modified flood control plan. (Stats. 1925, eh. 176, § 1.) The Grant Report, dated January 5, 1925, eight years after the
 
 Gray
 
 decision, found that Moulton Weir as planned (and which would have taken 185,000 second feet of excess water from the river and down a by-pass through Butte Basin), would require a diversion dam across the river and that the cost would be prohibitive; it found also that, at a public hearing, the sentiment expressed by Butte Basin landowners was against reclamation of the basin. The report, therefore, recommended that that part of the project be modified. In lieu of the works originally planned, a concrete weir was to be constructed at Moulton, “which would be little more than a paved sill secured against undermining by suitable concrete cut-off walls or sheet piling with a crest height at elevation 77 feet and a length of 300 feet.” The change would also require the construction of another weir 1% miles above Colusa. This weir was to have a crest height at elevation 62 feet and levees 2,000 feet apart, extending for one-half mile. This weir was to take 80,000 second feet of water when the river water was at elevation 70.4.
 

 The flood control plan thus briefly described is now being carried out by the state and United States jointly.
 

 Respondents have asked this court to disregard certain allegations of the complaints, which they say are contrary to the “facts” as written in the two California Debris Commission reports above referred to (and other supplementary reports). We gather it is their position that once an assertion by a publicly employed engineer reaches an official report, it thereby becomes indisputable and beyond the reach of adversary litigation or adjudication.
 

 It is, of course, true that the courts take judicial notice of all matters of science and common knowledge (Code Civ. Proc., § 1875, subd. 9), and of the reports of the California Debris Commission referred to above
 
 (Gray
 
 v.
 
 Reclamation Dist. 1500,
 
 174 Cal. 622, 648 [163 P. 1024]); that is to say, we take judicial notice of the fact that the reports were made, and of their contents. We do not, however, take judicial notice that everything said therein is true. (See 59 Harv.L.Rev.
 
 *742
 
 486;
 
 Stasiukevich
 
 v.
 
 Nicolls,
 
 168 F.2d 474, 479; McCormick on Evidence, 704. See also
 
 Williams
 
 v.
 
 City & County of San Francisco,
 
 24 Cal.App.2d 630, 634 [76 P.2d 182].) These reports are based upon studies made by engineers with opinions and conclusions drawn from those studies. But engineers are not infallible, nor are all statements contained in the reports, even though stated as facts, irrefutable. (If they were, then there could have been no justification for the Grant Report which modified the Jackson report, corrected errors therein, and changed the physical plan in several material respects where experience and further studies had proved earlier engineers’ assertions of “fact” and their conclusions faulty; e.g., crest width of levees was doubled from 10 to 20 feet—see Grant Report, § 17(d).) To assert the immutableness of statements in official documents would constitute abdication by the courts in favor of adjudication by engineering fiat.
 

 We cannot, therefore, assume—as defendants would have us do—that
 
 all
 
 of the waters diverted from the Sacramento River 75 years ago at Moulton by what the complaint tells us was at least partially a man-made opening were “flood waters”; nor can we assume that the secondary channel through which these waters are alleged to have flowed, and to have been carried past plaintiffs’ lands, was not a defined channel or watercourse at all but merely a part of that great catchment area known as Butte Basin. We could not assume these contradictions of the pleadings even if the reports mentioned categorically contained such contradiction. As a matter of fact, however, we find no such contradiction. (Whether or not plaintiffs will be able to prove the allegations of their complaint is another matter.)
 

 It is true, as respondents point out, that in
 
 Gray
 
 v.
 
 Reclamation Fist, 1500, supra,
 
 the Supreme Court took judicial notice that the Sutter Basin was not, in its entirety, a watercourse, that generalization (on p. 648) having been preceded by the statement that “Whether or not a watercourse exists is ‘to be determined as matter of law from the evidence in the case’ ” and the finding being followed by “ ‘The whole space between the foothills and a river is not to be called the channel because it sometimes overflows. ’ ” We could similarly judicially notice here that the whole of Butte Basin is not a watercourse. But this does not prevent litigation to establish whether or not specific excess waters taken from the river at Moulton by a private reclamation project had been carried in a well-
 
 *743
 
 defined channel and watercourse for some distance and around plaintiffs’ lands.
 

 This circumstance, alone, would require a reversal of the judgment. Nothing in the law of waters is better settled than the rule that any diversion of water from, or change in the course of flow in, a natural watercourse, attended by damage to private lands makes the actor liable under the maxim;
 
 Sic utere tuo, ut alienum non laedas,
 
 and, as applied to public agencies, under the constitutional right to just compensation for a public taking or damaging.
 
 (Bauer
 
 v.
 
 County of Ventura,
 
 45 Cal.2d 276 [289 P.2d
 
 1]; Southern Cal. Gas Co.
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 169 Cal.App.2d 840 [338 P.2d
 
 29]; Ward Concrete Products Co.
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 149 Cal.App.2d 840 [309 P.2d 546];
 
 Smith
 
 v.
 
 City of Los Angeles,
 
 66 Cal.App.2d 562 [153 P.2d 69].) This rule has been extended in
 
 Clement
 
 v.
 
 State Reclamation Board,
 
 35 Cal.2d 628, 638 [226 P.2d 897], to state interference with a channel artificially leveed by private individuals where substantial sums had been expended thereon and the system of private works had existed for 62 years. (This case will be discussed below.)
 

 In addition we cannot say that no cause of action could be proved here, even if we were to assume that all of the waters diverted were “flood waters” and that the diversion had not been through a definite secondary river channel. Merely to label waters as “flood waters”
 
 [2]
 
 does not, as we see it, necessarily give to the state
 
 carte blanche
 
 to dispose of said waters regardless of the reasonableness of methods employed and the quantity of damage which individual landowners may suffer as a result.
 

 Defendants argue that the case at issue is on all fours with the venerable (and still-respected) case of
 
 Lamb
 
 v.
 
 Reclamation Dist. No. 108,
 
 73 Cal. 125 [14 P. 625, 2 Am.St.Rep. 775], the first California case to apply the “common enemy doctrine” to flood control on the Sacramento River. In the
 
 Lamb
 
 case, defendant Reclamation District 108, located on the west
 
 *744
 
 side of the Sacramento River below Colusa, constructed, as a part of its plan of reclamation, a 40-mile portion of the west levee of the Sacramento River. In doing so, it closed off and filled all of the depressions and sloughs along the west bank, including one called Wilkins Slough. Plaintiff Lamb, a farmer whose riparian lands were located about two miles downstream from Wilkins Slough, but on the opposite, or east, bank of the river, complained that the closing off of the slough destroyed the relief which said slough had afforded to the east-side lands and caused the river to overflow its east banks, damaging plaintiff’s lands. He stated that this constituted a “taking” and sought to exercise his constitutionally guaranteed right to compensation. (Art. I, § 14.)
 

 It was held, however, that the damage was noncompensable. The court cited the English case of
 
 Bex
 
 v.
 
 Commissioners
 
 (8 Barn. & C. 355) where defendants, certain public commissioners, had constructed a jetty out from the seashore to protect their property from inroads of the sea, thus causing the water to flow with greater force upon the lands of plaintiff Cosens. The
 
 Lamb
 
 opinion states on page 130: “. . . The court decided that the commissioners were not liable, and that
 
 Cosens would have to protect his own lands,
 
 ...” (Emphasis added.)
 

 And quoting from the English decision, the court states: “. . . Lord Tenterden, C. J., in delivering the opinion of the court, said, among other things, as follows: ‘But the sea is a
 
 common enemy
 
 to all proprietors on that part of the coast, and I cannot see that the commissioners, acting for the common interest of several land-owners, are, as to this question, in a different situation from any
 
 individual proprietor.’
 
 ...”
 

 The rule that “vagrant” flood waters escaping from a stream and flowing wild over the country are the “common enemy” which a private owner (and therefore the state) may repel, even though such repulsion damages another has been criticized in its application to the state and public agencies. An article in 3 Stanford Law Review, 361, 365, points out the illogie of its blanket application since the state “is not merely acting as a landowner to protect some specific property interest of its own” and asserts: “Damage from a state flood control project should be handled as a police power question.” Application of the doctrine to the state and public projects has become firmly established despite such criticism and the sometime dissenting voices of Justices Carter, Curtis and Schauer (see the dissenting opinions in the
 
 Archer
 
 and
 
 O’Hara
 
 cases
 

 
 *745
 
 and the separate concurring opinions in
 
 Clement). (Clement
 
 v.
 
 State Reclamation Board,
 
 35 Cal.2d 628 [226 P.2d 897];
 
 Archer
 
 v.
 
 City of Los Angeles,
 
 19 Cal.2d 19 [119 P.2d 1];
 
 O’Hara
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 19 Cal.2d 61, 63 [119 P.2d 23];
 
 Weck
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 80 Cal.App.2d 182, 193 [181 P.2d 935];
 
 Stone
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 81 Cal.App.2d 902 [185 P.2d 396];
 
 Lamb
 
 v.
 
 Reclamation Dist., supra.)
 

 In an examination of the cases stating and applying the “common enemy” doctrine to flood waters, however, one significant circumstance will be found in all of them—the plaintiff, after the defendant’s damaging acts,
 
 will have the right to protect his own lands from floods and will be left to that remedy.
 

 Respondents state that the facts of the
 
 Lamb
 
 ease are indistinguishable from the facts alleged in the complaints before the court. We cannot agree.
 

 In Lamb, it will be noted, the plaintiff was left quite free to build levees around his own lands even though the effect of such reclamation would be to send these waters further on to someone else.
 

 [3]
 

 It is the absence of this right which significantly distinguishes not only the
 
 Lamb
 
 case from the instant case, but others to be discussed. At the heart of the “common enemy doctrine” is that whatever the private individual may do without paying damages the state may also do. This rests upon the proposition that the state constitutional guarantee against the taking or damaging of private property for a public purpose without just compensation (Art. I, § 14) creates no new right, but merely gives a self-operative remedy, but for which the damaged individual, because of the doctrine of sovereign immunity, would be left without redress.
 
 (Archer
 
 v.
 
 City of Los Angeles, supra,
 
 p. 24;
 
 Clement
 
 v.
 
 State Reclamation Board, supra,
 
 p. 636.)
 

 But the “common enemy” doctrine, applied to the state and its agencies, presupposes that the effect of the acts of the state and of that which an individual might do, are the same. Here they are not the same. In
 
 Rex
 
 v.
 
 Commissioners,
 
 as re
 
 *746
 
 ported in the
 
 Lamb
 
 case, Lord Tenterden said, in effect:
 
 Let Cosens protect his own lands.
 

 That is not possible here. Although the complaints before us do not expressly plead that respondents have taken a flow-age easement over plaintiffs’ lands, such is the necessary and inevitable consequence under the law and the flood control plan. (Also the complaints do plead a taking under Art. I, § 14.) Here the Reclamation Board would not, and could not, permit plaintiffs to reclaim their lands by repelling the water which, according to the complaints, respondents are now throwing upon plaintiffs’ lands, because the area in which plaintiffs’ lands are located has been reserved under the provisions of
 
 the
 
 flood control plan as an overflow area—just as have the lands within the by-passes. The river levees have been set far back from the river channel designedly for the purposes recited above. The areas between the levees on the river side thereof may not be obstructed. Plaintiffs now may no more erect levees or build up their lands in elevation otherwise to protect them from overflow than they could build a dam across the river itself. Their lands are now located in a permanent overflow area subject to bear the servitude of overflow forever.
 

 By Water Code, section 8596, the board can enjoin any acts interfering with its plan; by section 8598 diversion of waters to increase river flow is a public nuisance which the board may bring action to abate; by section 8707 the board may compel the removal of any obstructions which impede the free flow of water; by section 8708 it is unlawful for any person to interfere with
 
 or
 
 obstruct the operation of the state’s flood control works; by section 8709 any use of land in violation of section 8708 constitutes a public nuisance; no structure may be built within a by-pass or overflow channel without the permission of the board (§§ 8710-8718) and permission will be refused if the proposed work is injurious to or will interfere with the works of the project (§ 8723). Let plaintiffs now try to reclaim their lands and all of these statute-conferred powers could, and no doubt would, be invoked by respondents.
 

 On the other hand, express power is also conferred upon the Reclamation Board to acquire rights of way for bypasses and overflow channels by purchase or condemnation (§ 8590). By section 8619 similar right of acquisition is given for lands needed in connection with “any work of channel excavation, enlargement,
 
 rectification or control.”
 
 (Emphasis added.)
 

 The plans contemplate that respondent board shall acquire
 
 *747
 
 fiowage rights over by-pass lands and we believe it is a matter of history and “notorious fact” which we can judicially notice that millions of dollars have been spent for that purpose. These by-pass lands within the river basins have always been subject to overflow but receive a greater and more concentrated flow under the flood control plan because they are now within the narrower by-pass area. Therefore the Reclamation Board, using funds raised both by assessment and by appropriation, acquired fiowage easements over them. Yet if the argument now made by respondents is sound, all of this expenditure of public money was wasted because all of these waters were “flood waters” within the accepted definition, were the “common enemy,” and any damaging of these lands was
 
 damnum, absque injuria.
 

 As stated above, review of the “common enemy” cases in California applied to damages from flood waters will reveal that in not one of them has there ever been an instance of the subjecting of private lands to suffer a servitude of permanent overflow. In the
 
 Archer
 
 case,
 
 supra,
 
 no one was preventing plaintiff, whose lands were near La Ballona Creek, from protecting his lands from floods either by himself improving the outlet, or by other means. (In fact the opinion in
 
 Clement
 
 v.
 
 State Reclamation Board, supra,
 
 at page 637, asserts, regarding the holding in the
 
 Archer
 
 case, that the damages were
 
 damnum absque injuria,
 
 that “plaintiff must protect his own land from vagrant flood waters excluded from the lands of others . . . and he can assert no right of recovery of damages when the injury has resulted from his failure to take proper measures therefor.”) In
 
 O’Hara
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 19 Cal.2d 61 [119 P.2d 23], there is nothing to indicate that plaintiff was required to leave his lands as a permanent overflow area. The same is true of
 
 San Gabriel Valley Country Club
 
 v.
 
 County of Los Angeles,
 
 182 Cal. 392 [188 P. 544, 9 A.L.R. 1200], the case upon which both the
 
 Archer
 
 and
 
 O’Hara
 
 cases are based.
 

 On the other hand, the rule is settled that where the state either creates or increases a servitude over lands for the public benefit, it must, unless it acts properly within the limits of its police power, pay compensation.
 
 Podesta
 
 v.
 
 Linden Irrigation Dist.,
 
 141 Cal.App.2d 38 [296 P.2d 401], was not a flooding case. It was, however, a case where an irrigation district, after having reconstructed the channel of a stream to allow more summer flow to pass by, separating plaintiff’s lands, built bridges thereover to provide plaintiff with access
 
 *748
 
 between his two parcels. The district’s works were then discontinued, the stream flow reverted as before, and the bridges became dilapidated. Thereafter a successor of the original district restored the augmented stream flow but did not provide new bridges. It was held by this court (per Van Dyke, P.J.) that the original alteration of the stream could rightfully have been done by the irrigation district only in one of two ways—either by condemning the right or by agreement with plaintiffs; that it had elected the second course and was thus limited by the condition imposed by the contract, namely, the maintenance of the bridges.
 

 And the court states, on pages 49-50, that after disuse of the channel:
 
 “. . .
 
 [T]he burden of servitude imposed upon plaintiffs’ land by the presence of the channel, if it had ever changed, had reverted to the condition existing before the entry of the irrigation district. Therefore, when the appellant district, without leave or license, entered the channel, excavated it from its mouth down to and through the land of plaintiffs and claimed and exercised the right to flow through the land great quantities of water thus artificially introduced from the river, and exercised over the channel such secondary easements of control as were necessary to continue the use of the channel as a conduit, it did so wholly without right. These things it could not do, as the trial court found, without injuring, damaging and interfering with the very ownership, possession and use of plaintiffs’ land. It is still exercising those rights and insists that it will continue to do so and . . . is devoting the rights it has thus taken to a public use. We, therefore, have all the elements of a taking and damaging of private property for a public use without compensation paid....”
 

 Even if plaintiffs ’ lands here had been already subject to overflow before the acts of respondents (which the pleadings deny) and could be thereby said to be subject to a natural burden of overflow, respondents could not increase the burden without paying compensation.
 

 Where a flood control easement has been obtained across private lands, the extent of the easement is measured by the terms of the grant or by the declared or agreed nature of the proposed use at the time of acquisition, whether by deed or condemnation, and if thereafter the burden of the servitude is increased by change of plan resulting in greater damage, there is an additional taking.
 
 (Ward Concrete Products Co.
 
 v.
 
 Los Angeles Flood etc,. Dist.,
 
 149 Cal.App.2d 840 [309 P.2d;
 
 *749
 
 546]; see also
 
 Hume
 
 v.
 
 Fresno Irr. Dist.,
 
 21 Cal.App.2d 348 [69 P.2d 483], And see, generally,
 
 Winslow
 
 v.
 
 City of Vallejo,
 
 148 Cal. 723, 725 [84 P. 191, 113 Am.St.Rep. 349, 7 Ann.Cas. 851, 5 L.R.A. N.S. 851]; Civ. Code, § 806.)
 

 Not all damage to private lands in the course of the accomplishment of a public project requires compensation as an exercise of the power of eminent domain. This is illustrated by
 
 Gray
 
 v.
 
 Reclamation Hist. 1500, supra.
 
 There certain of the landowners whose lands were located east of the then proposed Sutter By-pass sought to enjoin the construction of the west levee of the by-pass (which was also the east, or back, levee of Reclamation District 1500). The theory of the complaint was that if a flood should come after these levees were built and before the east levee of the bypass was constructed, the flood waters would be thrown onto the plaintiffs’ lands. It is to be noted that the damages were threatened; not actual. If they occurred at all they would be temporary; not permanent (because as soon as the east levee was constructed plaintiffs’ lands also would be reclaimed). The court, after discussing the nature of the police power, said (on p. 646):
 

 “. . . [W]e hold that the doctrine of
 
 damnum absque injuria
 
 is applicable to the prospective temporary consequential damage which it may be found will be inflicted upon the plaintiffs’ lands by the future raising of a flood plane, which floods are of temporary duration and character,
 
 which raising the plaintiffs may protect themselves against,
 

 [4]
 

 and which floods, in the progress of the work, will be taken care of so that future injury will be avoided, all this under the state’s plan of vast magnitude and importance to abate, on behalf of the whole state, as well as for the benefit of private land owners, including these plaintiffs, flood conditions, which, if unchecked, would inevitably lead to the destruction of the navigability of the river and to the greater impairment and damage of all the adjacent land.
 
 Further than this it is not necessary here to go.”
 
 (Emphasis added.)
 

 Further than that, our research of flood cases indicates, no subsequent California case has ever found it necessary to go.
 

 It has been said: “Because the police power of a State is the least limitable of the exercises of government, such limitations as are applicable thereto are not readily definable. Being neither susceptible of circumstantial precision, nor discover
 
 *750
 
 able by any formula, these limitations can be determined only through appropriate regard to the subject matter of the exercise of that power.” (Constitution of the United States of America, 1952 ed., Lib. of Congress, Edward S. Corwin, editor, p. 982.)
 

 ‘1 Generally, it may be said that police power operates in the field of regulation, except possibly in some cases of emergency such as conflagration or flood when private property may be temporarily used or damaged or even destroyed to prevent loss of life or to protect the remaining property of an entire locality.”
 
 (Rose
 
 v.
 
 State,
 
 19 Cal.2d 713, 730 [123 P.2d 505], quoted in
 
 Podesta
 
 v.
 
 Linden Irr. Dist.,
 
 141 Cal.App.2d 38, 50 [296 P.2d 401].)
 

 Although no “formula” may be possible, some recent eases have furnished guideposts suggesting limitations to the police power.
 

 Justice Edmonds, in his concurring opinion in
 
 Bacich
 
 v.
 
 Board of Control,
 
 23 Cal.2d 343, 358-359 [144 P.2d 818], observes: “In considering this problem, the court must weigh the relative interests of the public and the individual, so as to arrive at a just balance in order that government will not be unduly restricted in the proper exercise of its function for the public good, while at the same time giving due effect to the policy in the eminent domain clause of insuring the individual against an unreasonable loss occasioned by the exercise of governmental power.
 
 ’ ’
 

 Justice Traynor, concurring in
 
 House
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 25 Cal.2d 384, 396-397 [153 P.2d 950], puts it more succinctly and narrows the field of applicability by asserting: “. . . The decisive consideration is the effect of the public improvement on the property and
 
 whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.
 
 It is irrelevant whether or not the injury to the property is accompanied by a corresponding benefit to the public purpose to which the improvement is dedicated, since the measure of the liability is not the benefit derived from the property, but the loss to the owner.” (Emphasis added.)
 

 Applying these principles, we believe there can be no doubt that the acts complained of here, if proved, would constitute governmental acts beyond a legitimate exercise of the police power and within the power of eminent domain, obedience to the exercise of which must be conditioned upon the payment of compensation. Whatever elusive Cheshire-cat evanescence
 
 *751
 
 the boundaries of the police power may be said to possess, the limitations thereof have certainly been reached long before the total destruction of lands (here alleged to have occurred) can be accomplished.
 

 Hereinabove we have stated the rule that public agencies may not divert water from or change the regular channel of a natural watercourse without payment of just compensation and in case after case efforts by the agency involved to justify denial of claims on the basis of the police power have been turned down by the courts. And we have pointed out that the rule as to “natural” channels has been extended by the Supreme Court to apply to a change of artificial channels long established in
 
 Clement
 
 v.
 
 State Reclamation Board, supra.
 
 Both parties here rely upon the
 
 Clement
 
 case. Appellants rely upon its holding. The holding of
 
 Clement, supra,
 
 on page 638, is that the state may not “without liability tear out a protection that has existed for 62 years to the lands of plaintiff upon which substantial sums have been expended in reliance upon the continuance of the protection.
 
 (House
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 25 Cal.2d 384 [153 P.2d 950].)”
 

 If artificial conditions exemplified by a long-established system of levees become “natural” then it does seem difficult to rationalize a contention that artificial conditions consisting of a flood control system of raised banks and excess waters diverted and bypassed through secondary channels as described in the complaints here, should not similarly be classified and protected against destruction.
 

 Respondents rely upon the following statement in the
 
 Clement
 
 case, at page 641:
 
 1
 
 ‘ The water that would have flowed through the Moulton and De Jarnatt Breaks before they were closed is flood water because it was not contained by the banks of the river. The water that was prevented from going through these breaks after they were closed remained flood water, and if it is that water that went over the Colusa Weir defendants are not liable. ’ ’
 

 Respondents would apply this statement as a rule precluding recovery by any damaged owner whose lands unhappily lie in the path of this redirected avalanche of water. The prospect of assertion of such a rule is frightening. It would be to say this: That the state may recapture the 185,000 second feet of water stated by the Grant Report to have flowed through the Moulton Break onto Butte Basin lands, the owners of which did not object to receiving them (see § 34 of the report), carry said waters 14 miles down the river in an
 
 *752
 
 artificially enlarged channel and divert 80,000 second feet of these waters by means of an artificially constructed Colusa Weir onto lands not theretofore subject to such overflow and thus subject said lands to the permanent burden of a servitude to receive these waters, all without payment of one cent of compensation!
 

 More particularly and as applied to the pleaded facts of this case it would mean that the state, in turning this vast flow of recaptured “flood water” down the river on its 14-mile course to the Colusa Weir, could flood all or any portion of the lands along the natural banks, lands which are pleaded, but not proved, to have been high and dry for more than 75 years, lands which from the map appear to comprise many thousands of acres—subjecting all these lands to the servitude of perpetual periodical overflow—all with complete immunity from liability. This effectually is respondents’ postulated theory. It is an argument which shows complete enchantment with the labels “flood waters” and “common enemy;” complete forgetfulness of the human limits of the police power. It also shows forgetfulness that flood waters only remain the common enemy so long as they are vagrant, i.e., “ ‘flowing wild’ over the country.” (See Hutchins, The California Law of Water Rights, p. 27.) When the cougar roams the mountains it is every man for himself, but certainly that does not mean that one may capture the beast, bring him to the city, then unleash him in the city park. No court has ever so abused the “common enemy” doctrine as to constitute it the common enemy of the riparian owner. This court will not be the first to do so.
 

 Still another settled rule applies here to necessitate a reversal of the judgment on the pleadings. The rules asserted above establish liability on the part of the state, regardless of negligence in the execution of the flood control plan. Here the complaints allege in addition that the plan was both conceived and constructed with negligence and contrary to good engineering practice. Also all of the acts alleged are deliberate acts in the completion of the flood control project (as distinguished from an act merely accidental). It is settled law that where a public agency
 
 negligently
 
 performs a deliberate act a component part of a public project, and the act damages private property, the agency is liable. This is true even where the act is done to repel the “common enemy.”
 
 (House
 
 v.
 
 Los Angeles County Flood Control Dist., supra, 25
 
 Cal.2d 384;
 
 Elliott
 
 v.
 
 County of Los Angeles,
 
 183 Cal. 472 [191 P.
 
 *753
 
 899];
 
 Ward Concrete Products Co.
 
 v.
 
 Los Angeles Flood Control Dist.,
 
 149 Cal.App.2d 840 [309 P.2d 546];
 
 Mulloy
 
 v.
 
 Sharp Park Sanitary Dist.,
 
 164 Cal.App.2d 438 [330 P.2d 441] ;
 
 Ambrosini
 
 v.
 
 Alisal Sanitary Dist.,
 
 154 Cal.App.2d 720 [317 P.2d
 
 33]; Hayashi
 
 v.
 
 Alameda County Flood Control Dist.,
 
 167 Cal.App.2d 584 [334 P.2d 1048].) The reason for this rule is that since the “common enemy” doctrine is predicated upon the theory that the state or its agencies may do only that which a private owner may do, and since no private owner is entitled
 
 negligently
 
 to injure his neighbor while repelling the common enemy, then neither is the state.
 

 (Negligent performance of a deliberate act which is an essential or component part of the execution of the project is not to be confused with accidental acts or omissions which are careless, e.g., the allowing of fire to spread onto adjoining lands while burning weeds in levee maintenance. (See
 
 Western Assur. Co.
 
 v.
 
 Sacramento & S. J. Drain. Dist.,
 
 72 Cal.App. 68 [237 P. 59].) The former eases come within the constitutional guarantee of just compensation; the latter do not— since they are merely tortious—and require a special statute waiving immunity, except as they may come within the limits of
 
 Muskopf
 
 v.
 
 Corning Hospital Dist.,
 
 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457].)
 

 Since the complaints here allege deliberate acts of negligence, a cause of action is alleged, irrespective of the questions raised by the “common enemy” doctrine.
 

 Summarized, the rules which we have applied in this case are these: (1) That courts may not judicially notice, in contradiction to a pleading, either (a) unadjudicated assertions in engineering reports—even those which bear the label “official”—or (b) generalizations in appellate decisions (in litigation involving other persons and other times) regarding topography and broad characterizations of waters and watercourses in a given area. Such statements are not res judicata; (2) That neither the “common enemy” doctrine, nor the police power can justify the subjecting of hundreds of acres of privately owned lands, previously “dry,” to the burden of a permanent and perpetual servitude of overflow; that the taking by the state or its agencies of such an easement for a public purpose is an exercise of the power of eminent domain and requires payment of just compensation to the end that individual landowners, thus damaged, shall not be required to bear more than their just portion of a burden which should be shared by all the taxpayers; (3) That deliberate acts
 
 *754
 
 negligently performed in the execution of a public project negligently conceived do not come within the “common, enemy” doctrine.
 

 These rules are not novel; they are fundamental. We cannot, therefore, restrain an expression of regret that an earlier application of such rules could not have been had so that the original generation of litigants might have seen their controversy determined.
 

 The judgments of dismissal are reversed.
 

 Peek, P. J., and Schottky, J., concurred.
 

 A petition for a rehearing was denied August 17, 1962, and respondents ’ petition for a hearing by the Supreme Court was denied September 11, 1962. Gibson, C. J., and Traynor, J., were of the opinion that the petition should be granted.
 

 That was precisely what was done much later when, in 1913, Reclamation Dist. 1500, of which the Lamb lands were a part, was created. In
 
 Gray
 
 v.
 
 Reclamation Dist. 1500,
 
 174 Cal. 622 [163 P. 1024], the plaintiffs whose lands were to the east, across Sutter Basin, claimed that the waters which were thus repelled by District 1500 would flood their lands. This case will be discussed later.
 

 [1]
 

 The
 
 Gray
 
 opinion (on p. 630) states: “The report found that in the American and Feather Rivers alone there were at least three hundred million cubic yards of material which must eventually pass down the Sacramento River to tide water. ...”
 

 [2]
 

 “ ‘Flood waters are those which escape from a stream or other body of water and overflow the adjacent territory.’ [Citing case.] . . . waters escaping because of their height from the confinement of a stream and running over adjacent property. Implicit in the definition of flood waters is the element of abnormality; they are flood waters because of their escape from the usual channels under conditions which do not ordinarily occur.”
 
 (Everett
 
 v.
 
 Davis,
 
 18 Cal.2d 389, 393 [115 P.2d 821].) They retain their character only while vagrant, i.e., ‘‘flowing wild” over the country. (Hutchins, The California Law of Water Rights, p. 27.)
 

 [4]
 

 4N.B. the statement italicized. It is effectually a limitation of the rule being pronounced to eases where no permanent flowage right is being acquired.