[Civ. No. 10600.   Third Dist.   April 17, 1964.]

CARNEY L. LOVE, Plaintiff and Respondent, v. JOHN WOLF et al., Defendants and Appellants.

Bronson, Bronson & McKinnon, Robert Hoffman, Pillsbury, Madison & Sutro, Eugene M. Prince, Noel J. Dyer, G. H. Eckhardt, Jr., and Glenn D. Newton for Defendants and Appellants.

Boccardo, Blum, Lull, Niland, Teerlink & Bell and Edward J. Niland for Plaintiff and Respondent.

PIERCE, P. J.—Plaintiff Carney L. Love suffered a serious and severe anemia following the administration of an antibiotic, chloromycetin, prescribed by defendant John Wolf, M.D., and manufactured by defendant Parke-Davis and Company. She recovered a judgment against these defendants after a jury trial and verdict in the sum of $334,046. They appeal.[1]

Misconduct of plaintiff's trial counsel, egregious beyond any in our experience or that related in any reported case brought to our attention has resulted in an unfair trial, a miscarriage of justice and requires us to reverse the judgment. Substantial evidence supported the verdict and judgment against the doctor (had the case been fairly presented). A new trial will be necessary against him. A closer question is raised by Parke-Davis' contention that it was entitled to a nonsuit and directed verdict. Our review of the record has convinced us the evidence establishes a case against it sufficient for jury determination on the issue of the adequacy of its warning of known dangers of its product and Parke-Davis will also be held for the new trial.

Chloromycetin is the trade name for chloramphenicol, a wide-spectrum antibiotic, meaning that it is an agent effective to kill or stop the growth of a wide variety of disease-causing organisms in human beings. This drug was developed and is exclusively manufactured by Parke-Davis. It may be administered only by doctors or on their prescriptions. It was first presented by the manufacturer in 1949.

In 1952, three years after the introduction of the drug, instances had been reported of association of aplastic anemia with its use. Aplastic anemia is one of a number of "blood dyscrasias." It is a rare and very frequently fatal (approximately 1,000 fatal cases annually in the entire United States) condition resulting in the depression or destruction of the

---

[1]The pharmacist who sold the drug to plaintiff was also sued. The jury's verdict was in his favor.

blood-forming elements in the bone marrow. It was first diagnosed in 1888.

When in 1952 the Food and Drug Administration received reports of connection between use of chloromycetin and aplastic anemia it commenced an investigation, enlisting the aid of the National Research Council, a public body of distinguished scientists. Pursuant to this request the council appointed a committee to study chloromycetin, and the recommendations of this committee, accepted by the council, were also approved by the Food and Drug Administration. The latter's decision stated that it had "weighed the value of the drug against its capabilities for causing harm and has decided that it should continue to be available for careful use by the medical profession in those serious and sometimes fatal diseases in which its use is necessary."

The statement noted the association of blood dyscrasias (including aplastic anemia) with the administration of chloromycetin and continued: "[a]lthough this complication has thus far been uncommon, it is sufficiently important to warrant a warning on the label, or packages of the drug and in advertisements of the drug and the recommendation that chloramphenicol not be used indiscriminately or for minor infections," and further "[w]hen prolonged or intermittent administration is required, adequate blood studies should be carried out."

A specified cautionary warning for circulars or packages and labels was prescribed.[2]

Parke-Davis immediately complied with the Food and Drug Administration's directive. Also, on July 7, 1952, it sent letters to 200,000 physicians. This letter advised them of the association between chloromycetin and aplastic anemia (also other blood dyscrasias) stating the number of cases was unknown "but it recognized that many have terminated fatally." It particularly warned of dangers from intermit-

---

[2]    "(TO APPEAR AT TOP OF CIRCULAR)

*"Certain blood dyscrasias (aplastic anemia, thrombocytopenic purpura, granulocytopenia and pancytopenia) have been associated with the administration of Chloromycetin. It is essential that adequate blood studies be made when prolonged or intermittent administration of this drug is required. Chloromycetin should not be used indiscriminately or for minor infections.*

"(ON THE LABEL)

"WARNING: *Blood dyscrasias may be associated with intermittent or prolonged use and it is essential that adequate blood studies be made.*' [Italics as in original release.]"

tent therapy and "indiscriminate therapy for minor infections." It pointed to indications of a "calculated risk involved in the use of this potent antibiotic so that alert clinical observations and adequate blood studies should be made to detect any depression of bone marrow function as early as possible, and before any irreversible state occurs." This was followed by another similar letter on August 12, 1952. The first letter promised: "as information accumulates from continuing studies on the relation of blood disorders to chloromycetin it will be disseminated promptly through appropriate channels."

These letters were intended to reach all doctors and pharmacists in the United States. They were supplemented by full-page announcements in the American Medical Association Journal. Advertisements and promotional material distributed by the company since 1952 have contained a condensed warning similar to that on the packages and the labels. Other details will be discussed more fully later regarding warnings to the medical profession, Dr. Wolf's knowledge thereof, and of the drug's dangers; also regarding the promotion (and alleged overpromotion) and sale of chloromycetin during the period 1952-1958.

In September 1958 Mrs. Love had been consulting Dr. Wolf for a female condition. She had also had a tooth extracted by a dentist. On one of her visits to Dr. Wolf she complained of a sore gum. The testimony conflicts as to the nature and extent of the gum condition. The dentist, who was also treating her all during this period, described a "dry socket," an inflammation without swelling or infection; Dr. Wolf testified to an ulcerated, infected gum. He prescribed chloromycetin. The prescription was refilled.

On November 4, 1958, Mrs. Love consulted Dr. Wolf for bronchitis. The evidence also conflicts as to the seriousness of this condition. Again the doctor prescribed chloromycetin, and again the prescription was refilled several times. Altogether 96 capsules of 250 milligrams each were dispensed to plaintiff. Dr. Wolf took no cultures and made no blood tests.

Dr. Wolf last saw Mrs. Love professionally in December 1958. Aplastic anemia was diagnosed in the spring of 1959 by a Redding internist. She was referred to a Stanford hematologist, Doctor William P. Creger, who has treated her ever since. He was one of her expert witnesses at the trial.

Other facts will be related in the discussion of the several questions to be resolved on this appeal.

*Re the Contention of Prejudicial Misconduct
of Plaintiff's Attorney.*

During the course of the trial which extended over the period from February 7 to March 15, 1962, defendant Parke-Davis made 20 assignments of misconduct and a motion for a mistrial. Defendant Wolf joined in the latter motion. His brief cites 33 instances of counsel's misconduct. Regarding the charge of misconduct, the Parke-Davis brief asserts: ''They saturated the trial from opening statement to closing argument. With gross exaggeration in some cases and no shadow of justification in others, plaintiff's counsel charged that chloromycetin was a killer drug which should never have gone on the market; that its distribution was in wanton disregard of humanity; that the safety of its users was sacrificed to astronomical profits; that Parke-Davis bribed a federal official to keep the drug on the market.'' Defendant Wolf, in addition, complains of numerous unjustified attacks by plaintiff's counsel upon the integrity of the attorneys for both defendants.

Because accusations of misconduct of counsel read out of context frequently exaggerate its seriousness and because the importance of this case justifies, we have been impelled to study, and have studied, a transcript of nine volumes (2,482 pages). Our own count shows 60 instances of plaintiff's counsel's flagrant misconduct. Our characterization is set forth in the second paragraph of this opinion.

Misconduct by plaintiff's attorney, Mr. Boccardo, permeated the proceedings. Counsel selected as his principal target Parke-Davis. Typical is the assertion in the opening statement that after Parke-Davis ''started to use this stuff *all over the country came reports of people dying from it,* people suffering from aplastic anemia and dying.'' Mr. Boccardo declared that chloromycetin should never have been on the market and that ''what I have talked about now so far is evidence of *absolute flagrant, wanton, negligence of failure to have any regard at all for humanity* and the safety of people using this stuff.'' He also stated: ''And all this time they knew that what it [chloromycetin] caused was nothing—it was only death. That is what it was causing, death.'' Later in the trial counsel referred to chloromycetin as ''a death-dealing drug.'' He also stated: ''There isn't a bigger *con outfit* in the world than Parke-Davis, and I will prove it before I get through with this case.'' Earlier Mr. Boccardo had stated (with reference to the ''New Drug Application''

leading to a permit to market the drug), "Now the fact that they were able to *con* the Federal Drug Administration doesn't establish the fact, etc." And finally in Mr. Boccardo's argument Parke-Davis became Fagin and Dr. Wolf, Oliver Twist. Then, mixing metaphors, Parke-Davis was a gangster and Dr. Wolf his gunman. Mr. Boccardo said:

"Did you ever hear of a Fagin, a guy that sits back and has a little kid go out and do the stealing? The gangster that sits back in protection in his apartment and points the finger at somebody? Somebody goes out volitionally and rubs that fellow out with a gun, he is apprehended, he is guilty of murder, isn't he? Certainly. He has pulled the trigger and he has killed a man, he is guilty of murder, just as Dr. Wolf is the man who fed her this drug when he shouldn't, and he is guilty of negligence, but who sent the fellow out to do the job? Who induced that fellow to do the job? Who by his representations caused him to do the job? Who by deliberately falsifying ads, but minimizing effects, by arguing with the Food and Drug Administration, by trying to get a minimization of the effects, brought it about? Their client, Parke-Davis."

Hereinafter we shall discuss the question of the substantiality of evidence to prove overprescription-induced-by-overpromotion of chloromycetin. The record, however, is wholly without conflict that, properly prescribed and administered, chloromycetin is, to adopt the language of the hematologist, Dr. William P. Creger, an expert witness called by plaintiff, a "very good drug," "a brilliant antibiotic," "a valiant ally" of the physician. It also is in evidence and uncontradicted that Parke-Davis is an almost 100-year-old pharmaceutical firm well respected by the medical profession.

We now discuss unfounded charges that Parke-Davis was guilty of bribery. From 1952 until about 1961, a Dr. Henry Welch was chief of the antibiotic division of the Food and Drug Administration. During this time he was also editor of a magazine, "Antibiotic Medicine and Clinical Therapy," a fact well known both in the Food and Drug Administration and the drug industry. Parke-Davis bought advertising in 12 issues of this magazine, arranging, through its independent advertising agency to have the issues distributed free of charge to 20,000 doctors in England and Scotland. A fact not well known (and there is no evidence Parke-Davis knew it) was that Dr. Welch was not only the editor of the magazine but half owner of a holding company, MD Publications,

which owned it. This fact was discovered and disclosed during a U. S. Senate investigation. Dr. Welch resigned from the Food and Drug Administration.

In his opening statement, Mr. Boccardo said:

"... [A]nd the evidence will show Parke-Davis was a very substantial advertiser in this little magazine owned by Mr. Welch, Dr. Welch, the head of the Food and Drug Administration, so that they had a buddy, the evidence will show, in the Food and Drug Administration, so instead of taking this stuff off the market until it was properly examined and properly tested, and something done about it, it stayed on the market but with a warning that was required, ..."

"... The evidence will show, ladies and gentlemen, that Parke-Davis and Company paid to Welch, through their advertising outfit, the sum of $100,000.00 in four $25,000.00 checks. Remember, he is the head of the FDA at the time this stuff was going to be taken off the market, and after that was done it wasn't taken off the market, but was permitted with this warning."

This, of course, is a thinly-veiled accusation that Parke-Davis had bribed the "head" of the Food and Drug Administration to permit continued sale of "stuff"[3] which otherwise would have had to be removed from the market, a charge based upon unconnected evidence that Parke-Davis had advertised in a magazine owned circuitously, and apparently secretly, by a Food and Drug Administration official (not its "head"). During argument Mr. Boccardo referred to "old boy Henry Welch on the payroll of Parke-Davis."

Repeated references were made to the large profits made by Parke-Davis from sales of chloromycetin. Evidence was admitted during the trial of the total sales of chloromycetin throughout the 1950's and in 1960-1961, stated both in grams and dollars. In 1961, the year of largest sales, the dollar figure was variously stated at between $68,000,000 and $80,000,000. This latter figure was repeatedly used by Mr. Boccardo argumentatively throughout the course of the trial. When actual argument was reached, this $80,000,000 became $76,000,000 in profit. In another point of the argument the inference is left with the jury that the profit is 4,000 per

---

[3]Throughout the trial Mr. Boccardo referred to chloromycetin as "stuff." This word can be employed to mean "materials, supplies or equipment used in various human activities." It can also be used synonymously with "rubbish" (Webster's Third New International Dictionary). In context there is no doubt Mr. Boccardo referred to it contemptuously.

cent. There was, however, no proof whatever of profits. None was offered. During the taking of evidence by assertions embedded in questions propounded to witnesses in Parke-Davis' employ who did not have, and could not have been expected to have, information on the subject of profit, Mr. Boccardo got before the jury: "Your job is to make thirty dollars profit on every one hundred pills, isn't it?" Statements while conducting cross-examination brought before the jury that "eighty million dollars worth of profit" would be "an ulterior motive" for the dissemination of misleading advertisements. During argument the statement is made as part of a plea for an award of damages in the full amount prayed for: "there is nothing unjust to a manufacturer who is making $75,000,000.00 a year out of a product to pick up the tab," and "[t]he evidence says they have $200,000,000 worth of sales and I point out that $750,000 [the prayer of the complaint] is about one day's sale, or thereabouts." Also included in the argument is the assertion "what has been exposed here, it is not only a business, it is a pretty good racket."

■ Before reaching the question of the impropriety of plaintiff's counsel's remarks, we will first digress to consider Parke-Davis' contention that *any evidence* of its wealth, earnings or profit from sales of chloromycetin was inadmissible.

■ The general rule is that "[a]ll facts having rational probative value are admissible, unless some specific rule forbids." (1 Wigmore, Evidence, 3d ed., § 10, p. 293), but "[t]he general principle of admissibility of relevant evidence is subject to a number of exceptions, based on 'counterbalancing factors' of 'extrinsic policy.'" (Witkin, Cal. Evidence, § 112, p. 134.) Among these, the most important, is "undue prejudice." (*Id.* p. 134; McCormick, Evidence, p. 319.)

■ Since justice is to be accorded the rich and poor alike (see *Griffin* v. *Illinois* (1956) 351 U.S. 12 [76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055]) evidence of the wealth or poverty of a party is ordinarily inadmissible either to prove liability or an award of damages and an argument to the jury regarding the wealth of the defendant will be reversible error. (*Weaver* v. *Shell Oil Co.*, 129 Cal.App. 232 [18 P.2d 736]; 32 A.L.R.2d 9, 19.) There are exceptions, however, as where the right to exemplary damages is an issue. (34 A.L.R. 3; 63 A.L.R. 1405; *Bille* v. *Manning*, 94 Cal.App.2d 142 [210 P.2d 254].) In *Miller* v. *Magill*, 130 Cal.App. 414 [20 P.2d

58], where the controversy between the parties rested upon a determination whether money admittedly paid by plaintiff to defendant had been intended as a loan or a gift, the court affirmed admission of evidence of the plaintiff's wealth and defendant's poverty as relevant to aid the jury to determine whether plaintiff's or defendant's version of the oral conversation attending the money's delivery should be believed. In a note in 32 American Law Reports 2d 16, it is stated: "There are, of course, various situations in which the financial status of one or the other of the parties is a relevant consideration, so that argument with respect thereto is proper. . . ."

Here it cannot be said that the wealth of Parke-Davis was relevant to any issue. Proof of its sales, however, expressed either in grams or dollars, *was* relevant to show a motive or reason for the alleged overpromotion of the drug, a definite issue in the case. The determination of whether such relevant evidence is, or should be, *admissible* is to be made by reference to rules covering the problem of restricted admissibility. We have pointed out above that no *absolute* special rule of exclusion applies to prohibit proof of dollar sales or profit. Being relevant and not within a rule of absolute exclusion it should be admitted—but only for a proper purpose, and under instructions of the court limiting it to that proper purpose. (Witkin, Cal. Evidence, § 115, p. 138.)

This does not mean that having elicited the evidence for a proper and limited purpose, a party's attorney may thereupon, by argument, urge its reception by the jury for an improper purpose. This is what occurred here. Mr. Boccardo could have argued with propriety to the jury that a large sales volume furnished a reason or motive for overpromotion and therefore made plaintiff's evidence of the latter believable. But he could not properly argue that the jury should allow large damages because the defendant was rich or because it could well afford to be held to absolute liability as a price for marketing chloromycetin. In *Miller* v. *Magill, supra,* at pages 418-419, this court stated: ". . . Where it appears in a case that either party has purposely and designedly stressed the point of the comparative wealth of the parties, we are then presented with a question of wilful misconduct, and the case will be treated accordingly."

Here the misconduct of plaintiff's counsel was first in arguing *unproved* profits and then in using his assertion as the basis of bias-incitement.

■  Mr. Boccardo showed himself a master of the "Do you know that" technique on cross-examination as a means of bringing before the jury matters not then in evidence and which were never received in evidence. The following is an example: In cross-examining Dr. Weston, a Parke-Davis witness, Mr. Boccardo, having first established that the witness knew a Dr. Woodward, then asked:

"Q. In the survey of Ted Woodward, do you recall that in all the cases, there were twenty-nine cases studied by him in which twenty-six resulted in aplastic anemia, one in severe anemia, two in thrombocytopenia, and twenty-one of the twenty-nine the patients were already dead before his survey was completed. Do you remember that?"

The witness did *not* remember that and was sure that Dr. Woodward had made no such finding. It is clear from the transcript that during this cross-examination Mr. Boccardo seemingly was reading from something. The jury, of course, would have assumed from the question he was reading from a survey by Dr. Woodward. Alert opposing counsel demanded production of the document. Mr. Boccardo then disclaimed he had been reading from such a survey. He neither produced a report by Dr. Woodward nor any evidence of any kind containing the statement quoted. He did, however, end the episode cryptically: "We have cleared that up, your Honor. That was the Welch." The statement remained before the jury whose members may well have taken into their deliberations the belief that some publication had established that out of 29 case histories of patients to whom chloromycetin had been administered all suffered anemia and 21 had died from it.

In another "did you know that" series of questions, Mr. Boccardo succeeded in bringing before the jury that several California counties had enacted legislation prohibiting the use of chloromycetin except for administration in hospitals. Having asserted over and over that this was not a misstatement, and he would prove its truth, *no such evidence was in fact produced.*

We had occasion in *People* ex rel. *Dept. of Public Works* v. *Lillard*, 219 Cal.App.2d 368, to observe (at p. 379 [33 Cal.Rptr. 189]): "These 'did you know that' questions designed not to obtain information or test adverse testimony but to afford cross-examining counsel a device by which his own unsworn statements can reach the ears of the jury and be accepted by them as proof have been repeatedly condemned."

We need not repeat herein the quotations from other decisions condemning this practice. (See *People* v. *Hamilton,* 60 Cal.2d 105, 116 [32 Cal.Rptr. 4, 383 P.2d 412] ; *McDonald* v. *Price,* 80 Cal.App.2d 150, 152 [181 P.2d 115].)

The examples of misconduct given above have been selected from many. They are, in our opinion, the most serious. Others were :

■ Mr. Boccardo's vilification and abuse of opposing counsel was reprehensible, although its effect to influence the jury was no doubt less prejudicial. Counsel for Parke-Davis was referred to as "an idiot" (several times), a "smart guy," a "laughing hyena." When counsel objected to Mr. Boccardo's obviously improper reference to Parke-Davis' "astronomical profits," Mr. Boccardo replied: "Can I make a statement or two without being interrupted, or do I have to floor you, Mr. Dyer?" This was one of several similar expressions made to one or another opposing counsel who were also invited to "step outside and do something about it." Their objections were characterized as "asinine" and as "hogwash." They were accused of suborning perjury. When defendant Wolf's attorney complained that he could not see the witness (apparently because Mr. Boccardo during cross-examination had placed himself between counsel and the witness) plaintiff's counsel asked if the attorney was ·passing signals to the witness.

Opposing counsel, voicing objections, were frequently told to "shut up" and the attorneys representing the several defendants who, of course, had sometimes identical and sometimes widely contrapositive interests on separate issues were accused of "sleeping together."

An able, highly respected, jurist of many years' experience and a well-earned reputation for courtroom control presided at this trial. Loss of such control in this case is unexplained and to us very puzzling. Excepting one mild characterization of conduct by counsel as "a little bit disgraceful" (made in such a manner that a reader of the transcript is left uncertain at which attorney the criticism was directed) and several expressions of disgust, such as, "Let's all go home. What do you say we all go home," there was almost no effort to keep the proceedings within the confines of propriety. ■ Respondent urges that defense attorneys also were transgressors. We could be more critical of several instances of *their* impropriety if the overall picture were not so patently one in which defense counsel, unprotected by the

judge presiding, were left to parry the thrusts of plaintiff's attorney as best they could.

▐ Plaintiff also contends that we should refuse to recognize the misconduct because defendants did not always object or ask that the jury be admonished. As any experienced trial lawyer knows, multiple objections have a tendency to alienate a jury's good will; particularly when, as in this case, the judge fails to rule on the objections made. And here many instances of misconduct *were* objected to. As for curing error by admonishing a jury, while this may be possible when error is isolated and unemphasized, an attempt to rectify repeated and resounding misconduct by admonition is, as counsel here has expressed it, like trying to unring a bell. (*People* v. *Lyons*, 47 Cal.2d 311, 318 [303 P.2d 329]; *Keena* v. *United Railroads*, 197 Cal. 148, 159-60 [239 P. 1061].) Moreover, in a number of the instances cited the judge here did not admonish the jury when requested to do so.

▐ Misconduct by plaintiff's counsel at the trial[4] being thus established, our destination, decision, will only be reached when we determine the question of its effectiveness to disturb due deliberation by the jury.

The case was not open and shut in any aspect. As to the liability of Dr. Wolf, evidence of great weight supported plaintiff's contention that the doctor, although possessing knowledge that chloromycetin should not be so administered, had prescribed it for use by plaintiff for two minor conditions and that the use was prolonged and intermittent. It was admitted that prescription was without the blood tests recommended in cautionary instructions. But there was also evidence supporting the contentions of said defendant that the conditions for which the drug was prescribed were serious infections, that his prescription of chloromycetin for such infections was a practice commonly followed by other doctors under similar conditions and the question whether the doctor

---

[4]And it did not stop at the trial level. Included in plaintiff's brief on appeal is a reproduction of photographs of Mrs. Love, one taken before and the other (with her attorney) taken after, the use of chloromycetin. The picture is not a copy of one in evidence. It was reproduced from a national magazine. The brief represents the picture is one ''vividly depicting the deplorable change in the plaintiff's appearance.'' Perhaps it does, but it also vividly depicts a deplorable departure from the record unquestionably designed as an ad hominem appeal to win the sympathies, and thus influence the deliberations, of this court. It was an effort not appreciated.

or the defendant pharmacist had been responsible for the refilling of prescriptions was vigorously contested.

Regarding the liability of Parke-Davis, a question closer than any other is presented (which will principally consume the remainder of this opinion), and this question is whether the evidence justifies any verdict against that defendant.

Although appellants do not argue the insufficiency of substantial evidence to support the $334,000 verdict, it by no means follows that a jury, unexposed to bias, would not have assessed plaintiff's damages more moderately. Plaintiff's condition at the time of trial was, and perhaps still is, serious. There has been marked facial and body disfiguration. According to the testimony of plaintiff's distinguished experts, an eventual recovery is doubtful. But an equally well known physician produced by defendants gave a much more hopeful prognosis. His examination, recent to the trial, included a bone marrow test. He found it "slightly reduced but not aplastic by any means." He stated: that there was a very low platelet count (platelets being the element in blood which permits coagulation and thereby stops bleeding), but that "her bone marrow is coming back," "improving," "regenerating." "[I]f she did not get into difficulty with serious bleeding as a result of the low platelet count, that the bone marrow might ultimately come back to normal and she might recover." He said: "[T]he prognosis becomes better and better the longer the patient lives." He believed the low platelet count was due to a hypersensitive state, an allergy. He stated: "[W]ith the passage of time I believe she has a very good chance for this marrow to return to normal."

Aggressive advocacy is not only proper but desirable. Our jurisprudence is built upon a firm belief in the adversary system. Moreover, in a long trial, as this one was, vigorously prosecuted and defended, frayed tempers leading to intemperate outbursts are a to-be-expected byproduct. Skilled advocates are not always endowed with "high boiling points." Juries, characteristically composed of average men and women, may be assumed able to withstand substantial blandishments without surrendering their ability to reason soberly and fairly. Recognizing these factors, reviewing courts are not, and should not be, overly eager to reverse for conduct which is merely moderately captious.

But there is a limit. The misconduct here was intentional, blatant, and continuous from opening statement, throughout the trial, to closing argument. It was committed

by a seasoned and experienced trial lawyer and the record leaves no doubt it was carefully contrived and calculated to produce a result. That sought-for result was so to arouse and inflame the jury that it would render a large verdict. The verdict *was* a large one; maximally so. ■■■ Counsel now argues we should assume, as the trial court did in denying a new trial, that the jury was not influenced. He both under-rates his own persuasive powers and argues inconsistently. When a skillful lawyer whose reputation bespeaks his power to influence juries strives advertently to achieve a given result and where the result is in fact achieved, how can a court reasonably say that his conduct played no role in the result? Borrowing the language of Judge Goodrich in *Seaboldt* v. *Pennsylvania R. R. Co.*, 290 F.2d 296, 300:

"... [I]t cannot be stated with certainty that all of this would have changed the result of the case. But, as said by the Supreme Court, a litigant who has engaged in misconduct is not entitled to 'the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent.' (*Minneapolis, St. Paul & S.S. Marie Ry. Co.* v. *Moquin* (1931) 283 U.S. 520, 521-522 [51 S.Ct. 501, 502, 75 L.Ed. 1243, 1244.)''

■■■ We are satisfied that Mr. Boccardo's grievous misbehavior was prejudicial and that justice miscarried. (Cal. Const. art. VI, § 4½; *Cote* v. *Rogers*, 201 Cal.App.2d 138 [19 Cal.Rptr. 767]; *Deibler* v. *Wright*, 119 Cal.App. 277 [6 P.2d 344].) We therefore reverse the judgment against both defendants.

### Re the Contention that Nonliability of Parke-Davis Was Established as a Matter of Law

■■■ Parke-Davis argues that reversal of the judgment against it should be with direction to the trial court to enter judgment in its favor. It asserts the record shows as a matter of law it was guilty neither of breach of warranty nor negligence.

Since the record shows without conflict that the drug was pure and uncontaminated in manufacture, negligence, if any, would have to be predicated upon evidence that the company failed adequately to warn of the dangers of its use.

Chloromycetin, as stated above, may be dispensed only upon prescription. Parke-Davis has no contact with the ultimate consumer of the drug, the patient. The duty, therefore, whatever its extent may be, must be a duty to warn the doctor who prescribes the drug. This would be the only effective means by which warning could help the patient.

■ One who supplies a product directly or through a third person "for another to use, is subject to liability to those whom the supplier should expect to use the ... [product] with the consent of the other ... for bodily harm caused by the use of the ... [product] in the manner for which and by a person for whose use it is supplied, if the supplier" (a) knows or should know the product is dangerous for that use, and (b) "has no reason to believe that those for whose use the ... [product] is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so." (Rest., Torts, § 388, p. 1039; see illus. 2, p. 1044.) This is the law in California. (*Gall* v. *Union Ice Co.*, 108 Cal.App.2d 303 [239 P.2d 48]; see also *Tingey* v. *E. F. Houghton & Co.*, 30 Cal.2d 97 [179 P.2d 807].) In the case of a drug it has been held there is a duty to exercise reasonable care to warn of potential dangers from use even though the percentage of users who will be injured is not large. (*Wright* v. *Carter Products*, 244 F.2d 53.) ■ But if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed. (*Magee* v. *Wyeth Laboratories, Inc.*, 214 Cal.App.2d 340 [29 Cal.Rptr. 322].)

We now apply those principles to the case at bench.

■ The facts stated above have shown that Parke-Davis gave the warnings, both on labels and packages, required by the Food and Drug Administration. They cautioned that aplastic anemia (and other blood dyscrasias) had been associated with the administration of chloromycetin; that adequate blood studies should be made when prolonged or intermittent administration of the drug was required; that the drug should not be used indiscriminately for minor infections; that it was a highly potent drug not to be used unless needed. Substantially all its advertising literature contained a similar warning in abbreviated form. Letters were dispatched intended to reach all physicians in the United States stating these warnings in great detail. In all it was estimated that the company had publicized warnings to the medical profession between 85 and 90 million times during the period from the introduction of the drug to the occurrence on trial. Dr. Wolf knew of the potential dangers (1) from the warnings from labels and packages received by him and from the advertising literature and letters received from Parke-Davis;

(2) also from studies made in medical school and a special research during his internship, and (3) from articles in professional magazines.

Parke-Davis refers to these uncontradicted facts and cites *Magee* v. *Wyeth Laboratories, Inc., supra,* 214 Cal.App.2d 340, as conclusive authority supporting its position that fulfillment of its duty of care was established as a matter of law.

Plaintiff counters with several arguments. She urges that the warnings required by the Food and Drug Administration were only minimal in nature, and says that if greater dangers known to Parke-Davis or which it should have known in the exercise of reasonable care were not included in the warning, its duty was not fulfilled. She also contends that even conceding a proper warning had been given Dr. Wolf and the rest of the medical profession, such warnings must be deemed cancelled out if overpromotion through a vigorous sales program persuaded doctors to disregard the warnings given. Such evidence, she states, was presented and the question of Parke-Davis' liability therefore became a jury question. She also contends that evidence supports a finding that Dr. Wolf's negligence was not the superseding sole proximate cause. Our careful reading of the record, resolving all reasonable inferences in this regard in plaintiff's favor convinces us that plaintiff's contentions, legally sound abstractly, are also sustained by substantial evidence.

First of all, the record leaves no doubt that once the Food and Drug Administration had investigated and certified the drug as a properly marketable antibiotic, Parke-Davis, over the years (the 1950's and in 1960-1961), vigorously and successfully promoted its use by the medical profession.

Plaintiff produced as expert witnesses several eminent hematologists who, although they freely conceded that chloromycetin, properly and restrictively used, was a valuable antibiotic, were emphatic in expressing opinions that its use was dangerous, attended by serious risks, that great care should be exercised in prescription and use, and that it should only be prescribed for a very limited number of diseases or conditions.

According to Dr. Creger (mentioned above), "chloramphenicol is what we call a toxic substance, (a) poison. . . . [W]hile medical science doesn't understand the way it acts . . . there is adequate evidence, in my opinion that [it] can depress, discourage the very elementary steps in the manufacture of body proteins . . . , [I]f you don't manufacture

them you don't make red cells or white cells or platelets . . . .
I think chloramphenicol works at this basic protein level.''

Having stated, as noted above, that chloromycetin was a
very good drug, he added: ''[I]t must be used in proper con-
text always.'' He said it was a ''drug of choice in typhoid
fever ... [and] in a number of diseases caused by the little
microorganisms rickettsia, I am thinking of Rocky Moun-
tain spotted fever . . . and typhus . . . . There are certain
urinary tract infections, and certain central nervous system
infections . . . resistant to other kind[s] of antibiotics where
chloromycetin may be lifesaving, and certainly certain forms
of the staphylococcus organism are best treated with chloro-
mycetin, *but when I have said—made these remarks, I have
said it, and what I have added up here is a small fraction of
all infections . . . that require treatment with an antibiotic . . . .*
[I]t is a small number.'' He also said: ''[I]f any other anti-
biotic . . . in common use is suitable for the infection under
consideration . . . one would not use chloromycetin in that
situation . . . because of its widely accepted tendency in some
patients to produce chronic bone marrow failure.''

Later, after stating that ill effects from the use of the drug
were not only in patients having an allergy, he said that it
was capable of being a ''protoplasmic poison,'' and spoke of
medically discernible effects in almost anybody using it, not
everyone being equally susceptible to its use, however.

He stated that between 1949, when the drug was first in-
troduced, until 1952, between 30 and 40 reports were pub-
lished in medical journals concerning the aftermath of use of
the drug.

An apparently nationally recognized hematologist, Dr.
Maxwell Wintrobe, a member of the special committee of the
National Research Council mentioned above, had given
a deposition which was read in evidence. Illustrative excerpts
from his testimony are: ''[C]oincidental evidence ... has oc-
curred so often that in my own mind I feel, I believe, that
this is a drug which should be used with extreme caution and
only used where no other antibiotic can be used because I
would not want to give this drug, in view of all this past
information, to any patient who could be treated by any
other means. ... Now someone might argue that this is purely
coincidence but I don't know how many coincidences one
wants to teach him to be careful. ... I would not use it and I
would warn doctors not to use it unless they had no choice.''
In another portion of his testimony this doctor stated: ''[I]t

would be wise for the manufacturer of the drug to suggest that it should be used ... only in the treatment of infections which cannot be readily treated by other antibiotics and which are of a serious character.'' Although he admitted there were other doctors who would disagree with him, he reiterated his opinion that he would use it ''only where there is nothing else that will do the job ... and I think that is the point that has not been emphasized enough.'' Again: ''I agree that it should be on the market but under very limited conditions.''

The reputation of plaintiff's experts was such that their opinions (some of which had also been expressed in articles of nationwide dissemination) must be deemed to have been inferably within the knowledge of Parke-Davis. While, as stated above, all of Parke-Davis' advertising contained the required warnings, they by no means expressed warnings of dangers consonant with the warnings plaintiff's experts as expressed above deemed required. On the contrary, those of the advertisements which are in evidence considerably ''play down'' the dangers. To illustrate: ''More than 11,000,000 patients have been treated with this important antibiotic. Truly one of the world's outstanding therapeutic agents.'' It was also stated: ''A review of the literature points up the fact that the great majority of investigators who study this drug clinically report no evidence of untoward reactions. Side effects occur infrequently with chloromycetin and, when encountered, are generally unusually mild for this type of therapy. ... Because a definitely lower incidence of untoward gastrointestinal disturbances occurs among patients receiving chloromycetin, interruption of therapy with this antibiotic is seldom necessary. Continuity of treatment with chloromycetin permits unhindered progress in the control of infection in the vast majority of patients.'' Quoted from some article in an advertisement of Parke-Davis is the statement: '' 'In no case have we seen any evidence of depression of the hemopoietic system resulting in aplastic anemia or agranulocytosis. We are now certain that chloromycetin is effective with very minimal untoward side effects.' ''

The evidence also showed that with this advertising the sales of chloromycetin had been built up until in 1961 $68,000,000 gross sales of chloromycetin out of Parke-Davis' total gross sales from all products of $190,000,000, figures which reflect that the use of the drug cannot have been limited to typhus, typhoid, Rocky Mountain fever, and the other

infections to which plaintiff's experts assert its use should be limited.

Parke-Davis, like other pharmaceutical manufacturers, sends salesmen throughout the United States known as "detail" men. There are 600 or 700 such representatives. Several doctors testified that these men extolled the virtues of chloromycetin, and minimized its dangers. It appears in evidence that the company knew that many physicians in the United States had been prescribing chloromycetin for conditions less than serious. It does not appear that the detail men were told to attempt to do anything to curtail this. It *was* told them by the company president that "the fact that a drug was administered prior to development of aplasia is by no means proof that the drug is the offender. At this time, there are absolutely no cases known to us in which such proof is extant." He said that there was "no valid scientific proof" that aplasia resulted from chloromycetin. The detail men were told that this was the position of the company and they were told so to inform the doctors they visited. They were also told (and presumably were told to relay): "Chloromycetin has been officially cleared by the FDA and the National Research Council with no restrictions on the number or the range of diseases for which Chloromycetin may be administered." These statements may have expressed literal truth. They did not, however, express "the whole truth, and nothing but the truth" as a fair warning which, according to plaintiff's experts, Parke-Davis should have been giving the medical profession.

The evidence of other doctors, including one practicing in Redding, was that Parke-Davis literature and the representations of its detail men did to some extent influence their use of chloromycetin, although, as one of them expressed it, such representations were received "with a grain of salt." Nevertheless, it is clear from their testimony that their use of the drug during this period was not limited to those infections for which its use should have been limited (or so the jury reasonably could have decided). It is also clear the jury could have concluded that Dr. Wolf was not so limiting its use.

Of course, if such overprescription by the doctor was not caused by the overpromotion of Parke-Davis then, however negligent such overpromotion may have been, Parke-Davis could not be held liable. Its negligence would not have been an inducing, or proximate, cause of the resulting injuries.

Dr. Wolf's negligence would have been an intervening, independent, and solely proximate cause. (*Magee* v. *Wyeth Laboratories, Inc., supra,* 214 Cal.App.2d 340, 349.)

On the other hand, if the overpromotion can reasonably be said to have induced the doctor to disregard the warnings previously given, the warning given is thereby withdrawn or cancelled and if, furthermore, the jury could have found that the doctor here actually prescribed the drug to cure an infection for which the company's advertising or its detail men had actually recommended its use, then the pharmaceutical company's negligence remains as an inducing cause coinciding with the negligence of the doctor to produce the result.

We turn therefore to a discussion of the evidence regarding the effect of Parke-Davis advertising and the statements of its detail men on Dr. Wolf's prescription of chloromycetin habitually and in this case. The doctor testified:

"It is true that in 1958 Parke-Davis detail men did start bringing up the use of this drug again and presented certain brochures and papers which suggested that it was useful and not as bad as it had appeared in 1952.

"Q. And did you rely on those representations, Doctor, in using this drug again to a greater extent?

"A. Well, I will say yes, but with this qualification, that with a negative literature, with a knowledge that my fellow physicians were using the drug, I think that I relied on this partly to influence me, yes. . . ."

He also testified there had been a complete blank in any literature during 1955, 1956 and 1957 warning against a wider use of the drug; that from this and the influence of Parke-Davis advertising and its detail men and the fact that his fellow doctors (also somewhat influenced by Parke-Davis advertising) had produced the "thought in my mind . . . that the possibility [of serious reactions] was no greater with it than . . . from the other drugs."

Dr. Wolf also testified that the conditions for which he prescribed chloromycetin were not trivial but were either actually or potentially dangerous infections of a type for which Parke-Davis inferentially had recommended use of the drug. The jury could have believed this testimony while still believing that the doctor was negligent in failing to follow the dictates of his training and study rather than the company's persuasive advertising.

The evidence we have stated in this regard is all one-sided, as we are required to state it when dismissal is sought upon the theory that no substantial evidence reasonably supports a

finding of fact establishing an appellant's liability. Evidence on behalf of Parke-Davis would have justified the jury's conclusion that chloromycetin *was in fact* an antibiotic having many more uses and with far fewer risks than the evidence stated above would indicate. It is only fair to state that from our reading of the record it appears that the company's officers and research men conscientiously believe that chloromycetin, which admittedly has been a lifesaving drug in many many thousands of cases, has in fact been a valiant ally of the physician in cases where the diseases cured were not within the limited category to which plaintiff's experts would have its use restricted, and, so believing, they consider that all of this advertising and promotion was justified. Parke-Davis also apparently is conscientiously convinced that there is actually no "valid scientific proof" of a causal relation between chloromycetin and aplastic anemia. What apparently is meant by that statement is that aplastic anemia being idiopathic (i.e., arising from an obscure or unknown cause) no one can say "with reasonable medical certainty" that the use of chloromycetin causes it. This has been stated (with reference to idiopathic conditions generally) more technically. It has been said that an etiological (causative) diagnosis is impossible "with currently available pathological and laboratory diagnostic techniques" (see, Forgotson, *Liability for Long Term Latent Effects of Toxic Agents,* 50 A.B.A.J. (Feb. 1964), page 142, and "For epidemiological purposes ... causative ... factors ... [can only be] evaluated by properly performed statistical studies" supported by "animal experimentation and laboratory studies." (*Id.,* p. 142.) Forgotson believes (p. 143) that "Proper rules governing proof of causation should not allow judges or juries to make scientific extrapolations which physicians or biologists themselves cannot *honestly* make" and "the time is ripe for the Bar, legislative bodies and legal scholars to consider a biologically sounder, juridically acceptable alternative proposal for resolving the causation question in present and future tort and workmen's compensation problems raised by consumer product, ... factors which have the potential for producing neoplastic and degenerative diseases in human beings." (*Id.,* p. 143.)

Nevertheless, this case was presented by both sides to the trial court and is presented here upon the theory that the opinions of experts, expressed in stare-decisis-approved terms of "reasonable medical certainty," were relevant ·to prove

causation. Plaintiff's experts gave opinions supporting her contention in those terms. We, therefore, must not only accept this evidence as sufficient to establish that chloromycetin was an extremely toxic agent which did cause Mrs. Love's anemia, but also we must accept the evidence leading to justifiable inferences that Parke-Davis, believing otherwise, had watered down its regulations-required warnings and had caused its detail men to promote a wider use of the drug by physicians than proper medical practice justified. We must, therefore, in reversing the case, retain Parke-Davis as a defendant to have the issues affecting the liability tried before a jury in a calmer, more contemplative atmosphere.

Other questions have been raised which must be considered.

### Re the Question of Implied Warranty

The evidence discussed above is, we have held, sufficient to present a triable issue on the negligence of Parke-Davis. The question is raised (and may be raised again when the cause is retried) as to whether the evidence justifies the finding of an implied warranty. In *Gottsdanker* v. *Cutter Laboratories,* 182 Cal.App.2d 602 [6 Cal.Rptr. 320, 79 A.L.R.2d 290], it was held that the consumer of a drug, although not in privity with the manufacturer, could recover on the theory of implied warranty for a nonnegligently distributed polio vaccine containing live virus. That case, however, involved a defect in the manufacture of the drug itself. In *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, it was held (on p. 62 [27 Cal.Rptr. 697, 377 P.2d 897]) that "a manufacturer is strictly liable *in tort* when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (Italics supplied.) But it is pointed out by Justice Traynor in his opinion in *Greenman* that the rule of strict liability, although sometimes expressed by the cases in terms of an implied warranty, is recognized to be one of liability "not assumed by agreement but imposed by law" and such cases "make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort." (*Id.,* p. 63.)

No rule of *strict* liability (whether expressed in terms of breach of an implied warranty, or in terms of a breach of a duty of care in tort) has been applied to a failure adequately to warn of the dangers inherent in the use of a drug. In *Magee* v. *Wyeth Laboratories, Inc., supra,* 214 Cal.App.2d 340, as stated above, it was held that the pharmaceutical

company did not owe a duty to warn the patient directly where it had adequately warned the doctor that the drug would be dangerous to rare individuals sensitive to its use and where the doctor knowing the danger took a calculated risk in prescribing its use. We have already held here there is a duty to exercise reasonable care to warn against the known dangers of a product.

■ "An assurance of safety, as well as a failure to warn of danger, may be negligence. Indeed the case for negligence here is even stronger. Whether or not the words constituting assurance amount to a warranty, or to a fraud, they will amount to negligence if they unreasonably involve the chance of harm from the danger they conceal." (2 Harper and James, The Law of Torts, § 28.7, p. 1548.)

There would appear, however, to be no sound basis to attempt to restate these rules in the terms of the law of contract warranties nor to extend them to impose a greater degree of care than that already stated.

### Re the Admissibility of Portions of a Congressional Investigation

■ Portions of the transcript of an investigation of chloromycetin in the hearings of the so-called "Kefauver Committee" of the United States Senate were admitted in evidence over strenuous objection. The admissibility is defended on two grounds: (1) that this was an official document of which the court could take judicial notice and (2) that it contained statements against interest made by certain officers of Parke-Davis. This evidence should not have been admitted. (1) ■ While courts take judicial notice of public records, we do not take judicial notice of the truth of all matters stated therein. (*Beckley* v. *Reclamation Board,* 205 Cal.App.2d 734, 741 [23 Cal.Rptr. 428].) ■ And the official character of a document will not make otherwise inadmissible material therein admissible. ■ (2) While the transcript excerpts did contain statements by an officer of Parke-Davis, who was a witness before the committee, which could be deemed statements against interest, actually the excerpts introduced were predominantly critical and caustic comments by the late Senator Kefauver regarding the practices of Parke-Davis in marketing chloromycetin. Admitted in evidence in this case, they were self-serving to plaintiff and tantamount to producing another advocate to argue plaintiff's case. Mr. Boccardo needed no such assistance. Any competent portions of the transcript would have been confus-

ing and meaningless without the inadmissible matter. The transcript on retrial should be rejected.

"... [R]elevance is not always enough. There may remain the question, is its value worth what it costs? There are several counterbalancing factors which may move the court to exclude relevant circumstantial evidence if they outweigh its probative value. In order of their importance, they are these. First, the danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy . . ." (McCormick, Evidence, p. 319.)

Other contentions relative to admission or rejection of evidence and of improper instructions given by the court have been indirectly answered by the discussion above.

This opinion may properly conclude with an observation. Decision on this appeal, reasonably prompt following oral argument, is, nevertheless, nearly five years removed from the transaction out of which the litigation arose. Elapsed trial time was more than 30 days. Cost of preparation and trial must have been large. Reversal for retrial may well project ultimate termination many months and even years ahead. These considerations alone give reason for regret that a more effective lubricating system cannot be engineered for the wheels of justice. This regret is augmented in this case by the feeling that the misconduct committed which makes reversal necessary was so pointless.

The silver lining, however, to the described cloud of futility and frustration may be in the following footnoted facts. We have been informed that a substantial sum has been paid by Dr. Wolf to Mrs. Love (without prejudice to the appeal). Also, as we have noted, equally distinguished medical experts testifying for the opposing parties, although giving widely-differing prognoses as to Mrs. Love's ultimate recovery, have all agreed that the running of time is a most important fact both in fixing the extent of her disability and in forecasting her life expectancy. This could mean that justice delayed, which is usually justice denied, may in the retrial of this case in a more temperate climate turn out to be justice more accurately measured.

The judgment is reversed.

Schottky, J., and Friedman, J., concurred.

A petition for a rehearing was denied May 11, 1964, and respondent's petition for a hearing by the Supreme Court was denied June 16, 1964. Peters, J., was of the opinion that the petition should be granted.